**Kris A. ZIMMER, Plaintiff,**

v.

**The TRAVELERS INSURANCE CO.; St. Paul Travelers Cos. Inc.; Constitution State Services, LLC; The Continental Insurance Co. a/k/a CNA; and Wells Fargo & Company, Defendants.**

**No. 4:04–cv–00542.**

United States District Court,
S.D. Iowa,
Central Division.

Nov. 20, 2007.

Christopher A. Kragnes, Kragnes Tingle & Koenig PC, Jeffrey S. Carter, Carter Law Office PC, Des Moines, IA, Bruce H. Stoltze, Eric M. Updegraff, Brick Gentry Bowers Swartz Stoltze & Levis PC, West Des Moines, IA, for Plaintiff.

William Thomas Barker, Scott C. Johnson, Sonnenschein Nath & Rosenthal LLP, Chicago, IL, CeCelia Ibson Wagner, Laurie Jo Wiedenhoff, Smith, Schneider, Stiles & Serangeli, Des Moines, IA, for Defendants.

MEMORANDUM OPINION AND ORDER ON DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL OR REMITTITUR, AND MOTION TO ALTER OR AMEND JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendants' "Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittitur, and Motion to Alter or Amend Judgment," filed March 29, 2007. Clerk's No. 193. Defendants filed a Brief in support of the Motion on May 31, 2007 (Clerk's No. 203) and Plaintiff filed a resistance to the Motion on July 2, 2007. Clerk's No. 215. Plaintiff filed a Brief in support of his resistance to Defendants' Motion on July 6, 2007. Clerk's No. 218. Defendants then filed an Amended Brief in support of the motion. Clerk's No. 224. Defendants filed a Reply on August 8, 2007. Clerk's No. 229. The matter is fully submitted.

I. PROCEDURAL BACKGROUND

Kris Zimmer ("Plaintiff") filed the present action on June 22, 2004, in the Iowa District Court in and for Polk County, Iowa. Travelers Insurance Company and Constitution State Services removed the matter to federal court on October 5, 2004, on the basis that all parties are diverse and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332. Plaintiff filed his First Restated Complaint and Jury Demand on October 8, 2004, alleging that during his employment with Norwest Financial, n/k/a Wells Fargo, in June 1999, he sustained an injury properly compensable under Iowa workers' compensation law. Plaintiff asserted that Defendants improperly denied his workers' compensation claim and that such denial constitutes bad faith under Iowa Code Chapter 85. Trial was held in the case from February 27, 2007 to March 6, 2007, and the Jury returned a verdict in favor of the Plaintiff. Clerk's No. 181. The jury found that Defendants acted in bad faith in the handling of Plaintiff's workers' compensation claim and that the Defendants' bad faith was a proximate cause of damages to the Plaintiff. The jury found the following items of damages:

1. $571,529 for past lost wages or earnings

2. $1,515,924 for loss of future earning capacity (present value)

3. $500,000 for past loss of function of body or mind

4. $3,000,000 for future loss of function of body or mind (present value)

5. $1,500,000 for past emotional distress

6. $3,000,000 for future emotional distress (present value).

*Id.* The jury further found by the greater weight of the evidence that the individual responsible for the bad faith were employees or agents of both St. Paul Travelers Companies d/b/a The Travelers Insurance Company ("Travelers") and of The Continental Insurance Company a/k/a CNA ("CNA") at the time of the bad faith conduct. *Id.* It was conceded throughout the proceedings that the individuals purportedly responsible for the bad faith conduct were employees of Constitution State Services ("CSS").

Following the reading of the Jury's verdict on March 6, 2007, the Court commenced a punitive damages phase of the trial. On the same date, the Jury found that each of the three Defendants, CSS, Travelers, and CNA (collectively "Defendants"), directed their conduct directly at the Plaintiff and awarded Plaintiff $1,000,000 in punitive damages against each of the three Defendants, for a total punitive damages award of $3,000,000.

Defendants now argue numerous errors in the Court's evidentiary rulings, jury instructions, and in the Jury's verdicts. The Court will address each argument in turn.

## II. FACTUAL BACKGROUND

### A. *Events through August 3, 1999*

The facts presented at trial were essentially the same as those presented by the parties in the Court's prior ruling on the parties' Motions for Summary Judgment. The Court incorporates those facts by reference, but summarizes the relevant facts here. Plaintiff was born March 6, 1960. In 1988, Plaintiff had a decompression laminectomy and fusion for a work-related injury he sustained while employed by Allen Test Products. There were complications during the surgery, resulting in partial damage to Plaintiff's S1 nerve root and an impairment of 25% was assigned Plaintiff's physical impairment from the operation.

On July 15, 1996, Plaintiff commenced employment installing computers with Norwest Financial, n/k/a Wells Fargo (hereinafter "Wells Fargo"). He continued to experience low back pain and received treatment for his back problems, and for stress-related symptoms,[1] from Dr. Carol Horner, his primary physician. Beginning in February 1999, Dr. Horner referred Plaintiff to a series of doctors for treatment of his back pain. These doctors included Dr. McGuire, Dr. Igram, Dr. Stein, Dr. Toriello, and a psychiatrist, Dr. Koithan.

On June 1, 1999, Plaintiff claims he felt a rip in his back when he helped a consultant pick up papers that had been dropped in the street and were being blown by the wind. Plaintiff informed his supervisor, Dennis Woolums, and eventually was sent home from work. On June 2, 1999, Plaintiff presented at Des Moines General Hospital ("DMGH") for treatment. According to the emergency room report, Plaintiff

---

**1.** Dr. Horner's records reflect that she was treating Plaintiff for stress-related symptoms as early as 1987.

was seen at DMGH by Dr. Javaid Abbasi. Trial Ex. J–9. The report lists Plaintiff's "Chief Complaint" as a one-day history of "[t]ingling sensations on the three fingers of the left hand with discoloration on those fingers." *Id.* Dr. Abbasi noted that Plaintiff "[i]s remarkable for back problems" and that he previously had back surgery. *Id.* Under "Review of Systems," Dr. Abbasi states: "[Plaintiff] is remarkable for tingling and bluish discoloration of the three fingers of his left hand since yesterday. The patient denied any falls or injury. . . . He does complain of back pain, which is chronic in nature." *Id.* Dr. Abbasi concluded with an impression of "possible vasculitis" and notified Dr. Horner, who "present[ed] to the emergency room to assume care of the patient." *Id.* Dr. Horner wrote a note [2] excusing Plaintiff from work "from 6/1/99 until released due to medical illness." Trial Ex. J–22.

On June 3, 1999, Plaintiff went to see Dr. Rettenmaier, apparently on referral from Dr. Horner. Dr. Rettenmaier's report states:

This 39–year old white male presents for evaluation basically for a variety of pain issues, primarily left sided leg greater than arm, as well as some recent vague discoloration changes in his hands. He dates the onset of his problems to 1988. He apparently had an injury and developed what sounds to be radicular symptoms. . . . He talks about basically having chronic numbness and tingling down his left leg on the posterior aspect all the way down into the foot. He also talks about some off and on pain. Interestingly, over time, his back pain basically improved significantly. . . . About 2 ½ years ago, he started developing some other pain issues. He apparently start-

ed having some pains that started in the left side of his lower back and chest and moved up into his arm. He talks about pains that radiate up his arm up into the left side of his face and neck. He apparently had workup at that time. He ended up being treated for anxiety issues. It sounds like he got better control of that. Then since January of this year, he has had progressive worsening. . . . He talks about low back pain that has been unmanageable. In the past, it has always been manage[able], but has subsequently been unmanageable. . . . Tuesday around 2 p.m., he apparently missed his Xanax, an hour late. He developed the sudden onset of discoloration in his left hand. . . . He also has been having a lot of anxiety issues. This apparently has been a significant problem for several years. About 2½ years ago, he apparently had stress at work and dropped 35 pounds in a quick period of time. . . . He admits to a lot of work stress. He readily admits to anxiety issues. . . . He really does not describe work depressive symptoms. . . . The physical exam today revealed . . . he appeared quite anxious. He had great difficulty bearing weight on his left leg. He was constantly moving about and fidgeting in the chair. He did appear to move to the right side to take weight off his left side. He obviously had difficulty getting up to the exam table. I had to help him. He hobbles on his left leg. He has difficulty weight bearing from what presumed to be his pain. . . . He has no classic findings of full blown dystrophy in the sense of swollen, edematous phase hands and touch-me-not type symptoms. . . . He could not stand on his tiptoes. How much was pain and giveaway weakness,

---

**2.** Dr. Horner's note excusing Plaintiff from work was *not* received by Defendants or entered into the claim notes prior to Defen-

dants' denial of Plaintiff's claim on August 3, 1999.

I could not tell. He had somewhat of a forward hunched appearance. . . .

Impressions: Chronic pain syndrome. For the most part, I think this is going to be the primary underlying diagnosis. As you are aware, chronic pain is basically a diagnosis of exclusion. He has so many symptoms that it is difficult to sort through. . . . One wonders whether he has an element of dystrophy problems as well. . . . Given the variable nature of his symptoms and the fact that they are somewhat unusual, I did suggest that it would certainly be reasonable to pursue studies such as a three phase bone scan and EMG and nerve conduction velocities of his left arm and left leg. . . .

Recommendations: For the most part, I think that, given the severity of his problems, his loss of livelihood, the excess anxiety issues, and the fact that he is already on narcotics and is not functioning, I am not sure that management as an outpatient initially is really the appropriate choice for him. I think that management as an inpatient in the near future would probably be most appropriate. As far as ruling possible objective features, we can certainly do that in an inpatient setting rather than wait.

Trial Ex. J–10.

On June 10, 1999, CSS adjuster Tina J. Beerbower ("Beerbower") received a call from "Michelle" at Wells Fargo informing her of a workers' compensation claim being made by Plaintiff. Trial Ex. J–6. Michelle advised Beerbower that Plaintiff claimed he "was coming from one office to [another] and he had parked his car and he had confidential papers that started flying around. He bent over to pick them up and felt pain in his back." *Id.* Michelle advised Beerbower that she was not informed of the incident until June 9, 1999, but that Plaintiff did tell his supervisor on June 2,

1999 "that he had hurt his back the day before." *Id.* Michelle further advised that Plaintiff had "no vacation or floating holidays left. He has used all his sick time also"; that "everybody that works with [Plaintiff] knows he has a bad back"; and that she had spoken with Plaintiff's boss, who stated: "[H]e walks like he does any other time that he has a bad back." *Id.* Though Plaintiff claims that he told a colleague who was with him at the time of the blowing papers incident that he had hurt his back, Michelle advised Beerbower that "Plaintiff did not inform Tim E[n]os that he had hurt his back on 06/01/99." *Id.*

Beerbower testified at trial that CSS's policy was, within twenty-four hours of receiving a claim for workers' compensation benefits, an adjuster is supposed to initiate a three point contact, meaning that the adjuster should have contact with the employer, with the injured worker, and should begin collecting medical records from providers identified by the injured worker. Trial Tr. at 45–46, 49 (Beerbower testimony). On June 10, 1999, Beerbower contacted Plaintiff to take his statement. While a tape recording was made of the interview, it appears to have been misplaced. Beerbower's notes of the interview reflect the following:

I called and talked with IW [injured worker]. He kept telling me that he has had previous back problems and when he bent over to pick up some confidential papers off of the ground he felt a rip in his left side of his lower back. He states he takes narcotics on a regular basis for his continued back pain, but that his back is really hurting him now. He states that he informed Tim Enos that he had hurt his back when picking up the papers off of the ground. He states he was in the army from 1977 to 1983 and was also in the IA National Guard. He was discharged honorably.

He states he has seen Dr. McGuire in April and has seen Dr[s]. Igram and Stein in April. He has also seen Dr. Toriello and Dr. Rettenmaier along with Dr. Horner. He was seen in the ER at DMGH on 06–02–99 when he woke up that AM. He states he is taking Oxycontin, Darvoxet, Voltaren, Zanax, Prozac and Lipitor. He was taking Flexeril but had discontinued it. He states his treating doctor is Dr. Horner and he has had an MRI done this year. He states he has not had any physical therapy at this time. He states he was informed before this incident that he needs to do exercises and stretching. He states he does minor drywall repair at his home when it needs to be done. He states he makes clocks and plays cards. He walks about ½ mile a day with his wife. He states he does house repairs. He sprays his deck and will replace a gasket when it needs to be done. He states he was at home the day before the day in question. He kept saying over and over that this was the final straw that broke the camel's back. He has had a previous back injury in 1985 and had a 25% impairment rating. He worked for Allen Test Products at that time. He states Travelers settled his claim with him.

Trial Ex. J–7.

On June 11, 1999, Beerbower scheduled an appointment for Plaintiff with Dr. McGuire on June 14, 1999. On the same date, Beerbower contacted Drs. Igram, Stein and McGuire's offices by telephone to request medical records, and additionally made arrangements to get medical records from DMGH, Mercy Arthritis Center, and Drs. Toriello and Horner. Beerbower also interviewed Tim Enos, the witness identified by Plaintiff. While Plaintiff maintains that he told Enos that he had hurt his back bending over to pick up the fly-away papers, Enos only confirmed that he saw Plaintiff bending over to pick up papers. According to Beerbower: "[A]t no time did [Plaintiff] tell [Enos] that he hurt his back."

Dr. McGuire's notes from Plaintiff's visit with him on June 14, 1999, reflect the following:

> Kris comes in today. Apparently he had an incident approximately 6/1/99 when he was downtown and a "subordinate" dropped some very important things and he looked down and saw all these papers flying by him on the street and he went running after them and leaned over to pick [up] these things.... Anyway so his pain is worse. When I started to talk to him about when and how all this started his comment was that it started in September of 1997. He then went into a lengthy story about an e-mail message. He firmly believes all his back pain is related to stress relating from this incident at work in 1997. I saw him back in March. Apparently he saw somebody else in late May. He then had the work incident. He went to the emergency room. They tell a very involved story about skin color changes on his 4th and 5th digits and his hand and those types of things....
>
> Physical Examination: Gentleman appearing basically stated age. He sits here reasonably comfortably but he gets up with real difficulty. He stands forward flexed, knees flexed. His spine is almost kyphotic in the lumbar spine. He moves about the room in a very awkward manner.
>
> Impression: 1. Obvious conflict at the job site
>
> 2. Readily admits stress with this incident at work
>
> 3. Documented weight loss etiology unexplained
>
> 4. Antecedent history of back problems from 1998

5. Recent history of back symptoms seen here in March of 1999 and they are getting worse.

Treatment Plan: His back is the somatization of all his other problems. There is absolutely nothing for me to do. He needs to resolve stress and psychological problems before we can do anything. That is far, far out of my hands.

Called and talked to Tina. From my standpoint, as far as the spine is concerned, he can be working full time. As far as the psychological problems and his dealing with superiors and other people, that needs to be resolved and that is in somebody else's area of expertise.... As far as the back is concerned he could be working. The psychological problems and the job conflict situation would probably prevent him from working.

Trial Ex. J–12.

On August 3, 1999, Beerbower entered in the claim notes a "Phone call with Michelle." Trial Ex. J–15. Beerbower wrote: "Michelle called and wanted an update on the claim. I told her that I was still waiting on the notes from Dr. Horner. I told her at this time I will be denying the claim. That the IW went to the ER at DMGH and did not indicate that he was having any back problems. I still need the notes form Dr. Horner. She does agree with the denial. I told her that I will send out the denials today." Trial Ex. J–15. Approximately one minute after Beerbower's entry regarding her conversation with Michelle, she made another entry regarding "Phone Call with Lisa." Therein, Beerbower stated: "I called and talked with Lisa. She states Dr. Horner is very slow with regards to authorizing the release of the medical records. I told her that I requested the medical 2 months ago and then again last month and still have not

rec[eived] the notes. I told her that we need to get the notes ASAP. She states she will see what she can do." *Id.* A mere three minutes later, despite not having the medical records from Dr. Horner, Beerbower entered into the claim notes: "Claim is Denied. IW has not overcome the burden of proof. IW had indicated that he had went to DMGH ER for his back, however nothing in the ER notes indicates this. Also IW had treated for his back about 3–5 days prior to the alleged incident. I also talked with the gentleman that was suppose[d] to have witnessed the injury. He did not confirm that this IW had hurt his back. He also stated that the IW did not tell him that he had hurt his back at work." *Id.* The same day, Beerbower sent the following letter to Plaintiff:

This letter is being sent to you in regard to our recent receipt of your worker compensation claim with a date of loss of 06/01/1999. Our investigation has been completed and, at this time, we must respectfully deny your claim based on the information we received. The medical records do not support your alleged injury.

Trial Ex. J–16.

### B. *Events after August 3, 1999*

On approximately August 6, 1999, CSS received a copy of Dr. Horner's records pertaining to Plaintiff. These records were not entered into CSS's claim notes, but demonstrate a history of care dating back to July 8, 1997. Trial Ex. J–22. References in Dr. Horner's notes reflect Plaintiff's ongoing problems with his back. In an August 27, 1999 report,[3] Dr. Horner wrote:

The patient reports that he bent over to chase some papers on June 1, 1999

---

**3.** While some of Dr. Horner's records were received by Defendants on August 6, 1999,

others generated after that date clearly were received at a later time.

about 9:10 in the morning on 8th Street outside his home office. He was trying to pick up some of the company's confidential memos, apparently some QA type forms. These were previously in a binder folder. The patient was plugging a parking meter with quarters when he looked up and saw the papers flying up the street. Previously they were in the back seat of his car in a binder. Another employee or co-worker was apparently getting these papers out of the car. Paper hit his leg. The patient picked this up, saw that it was confidential, and went in pursuit of the other papers. When bending over to pick these up he noticed the feeling of something ripping or tearing in his left lower back. He had to leave work later that morning, about 10 o'clock, due to the pain in his back. The next day he went to the Des Moines General emergency room where I saw and evaluated him.

*Id.* A report dated September 7, 1999, by Dr. Horner states: "As I recall, the patient's presenting complaints included severe back pain and problems with dermatologic lesion." *Id.* On that date, Dr. Horner noted that Plaintiff's back was stable, and that "periodic examinations of severe pain" were in order. *Id.* Beerbower did not re-open Plaintiff's claim to determine if Dr. Horner's records affected her basis for denying the claim.

Subsequent to the denial letter of August 3, 1999, Defendants also received records from Dr. Leth, who noted that on July 12, 1999, Plaintiff was seen "with mechanical left-sided low back pain. He also had a fairly graphic presentation of a manic type mental illness." Trial Ex. J–14. Dr. Leth saw Plaintiff again on August 3, 1999, and again noted that Plaintiff was suffering from "continued back pain," but that he "continues to show signs of significant mental illness, which appear to be impairing his ability to improve sympto-

matically . . . his mental illness appears to be prominent." *Id.* On that date, Dr. Leth stated: "My recommendation continues to be if the patient would like his pain treated then state-of-the-art approach is radiofrequency denervation." *Id.* On September 28, 1999, Dr. Leth stated that the "overwhelming finding in our office for his medical evaluation was that of severe mental illness and delusional and paranoid thoughts." *Id.*

On April 3, 2000, Plaintiff contacted Chris Crawford, CSS Unit Manager, via e-mail to request "a copy of all documentation in regards to my two pending work comp claims." Trial Ex. J–33. On April 17, 2000, Plaintiff again e-mailed Crawford, stating "I have about 400 to 500 pages of medical records to send to you." *Id.* In this e-mail, Plaintiff discussed his 1988 surgery and noted that "Travelers settled out of court with me." *Id.* Plaintiff also stated:

I have just had back surgery [on] March 3, 2000, and I am in the recover[y] phase of the operation as far as my back is concerned. Despite Dr. McGuire's statement that my back pain is all in my head, this is completely false and I have psychiatrist's medical record to back me up. Also despite Dr. McGuire's claim that there was no logical surgery for me I had to go out of town and have a neurosurgeon from New Jersey put two titanium cages between my L5 and my L4 vertebraes. My neurosurgeon has told me that now there is more spinal surgeries for me. I still have severe debilitating pain in my left leg and also it is progressing into my right as well. . . . I have depression because of my leg and back pain and continue to see a psychiatrist for these problems. . . . These are as valid claims that there can be. Please treat them as such. I do wish to settle these claims

with Travelers out of court as was done back in 1988. . . .

*Id.*

Crawford noted the following in Plaintiff's claim file on May 8, 2000:

Had a very long conversation with the IW today. He claims that all the medical records from the Des Moines Providers (all) have errors and that we should only take into consideration Dr. Giordano who IW is treating with now. Actually the IW told me that he recently received a report from Giordano and IW is asking for some corrections due to the errors in his report. All in all, our position really does not change.

Trial Ex. J–15. On May 17, 2000, Crawford wrote in the claim notes, "I am [going to] reopen this file. I am going through each and every medical record to evaluate this claim. May send some letters and old medical records out to Dr. Giordano." *Id.* Also on May 17, 2000, Crawford spoke with Dennis Wolloms, who was Plaintiff's supervisor on June 1, 1999. In the claim notes, Crawford noted that "[Wolloms] recalls the IW coming in on 6/1/00 and reporting that he was bending over to pick up papers and injured his low back. Dennis sent the IW home on the DOL [date of loss] due to the pain the IW was complaining about and that he was sick due to the pain." *Id.*

Just over three hours after Crawford reopened the claim file, he noted that he had reviewed various medical records from Drs. Horner, McGuire, Leth, Toriello, Rettenmaier, Stein, Igram, and Abbasi. The next day Crawford noted that he had sent a causation letter to Dr. Giordano. Crawford testified at deposition that he is unsure whether he had Dr. Giordano's medical records or whether he reviewed them, but found it appropriate to direct a causation letter to him because Plaintiff had identified Dr. Giordano as the only one of his providers with accurate information. In his letter to Dr. Giordano, Crawford enclosed records from Dr. Toriello, Dr. Igram, Dr. Stein, and Dr. Rettenmaier. Crawford wrote:

Given all the information above, I have really only three questions and they are as follows: Can you state within a reasonable degree of medical certainty that the cause of Mr. Zimmer's back pain and resulting surgery is directly related to the reported work injury on June 1, 1999? If so, please explain your rationale. Is it possible that the three falls in the three weeks prior to the May 28, 1999 office visit as documented by Dr. Stein could have been responsible for the increase in symptoms and the need for surgery?

Trial Ex. J–35.

On June 5, 2000, Crawford received a causation letter from Dr. Giordano, which he entered into the claim notes:

Thank you very much for your letter of May 17, 2000 in which you summarized much of the previous history relating to Kris Zimmer. As a physician, I can only go on what the patient tells me, but it is completely obvious by the well documented records from competent physicians, that the patient had similar problems with his back and legs long prior to his reported incident of June 1st. Therefore, I cannot say with any degree of medical certainty that the cause of Mr. Zimmer's back pain and resulting surgery was directly related to the reported work injury of June 1st of 1999. Secondly, it is certainly possible that the increasing falls that were occurring prior to May 28, 1999, could have exacerbated Mr. Zimmer's symptoms, which ultimately made him a surgical candidate.

Trial Ex. J–37.

The day after receiving Dr. Giordano's causation letter, Crawford wrote in the

claim notes that, "given my review and the new report from Dr. Giordano, I am going to stand on the denial of this claim. I will forward a letter to the IW." Trial Ex. J–15. Crawford noted the same day that he anticipated litigation on the matter soon. *Id.* Crawford sent a letter to Plaintiff stating that his claim was still denied and closed the file on August 10, 2000. Trial Exs. 15, 39.

## III. LEGAL STANDARDS

### A. *Motion for Judgment as a Matter of Law*

Federal Rule of Civil Procedure 50(a) provides that at any time before a case is submitted to a jury, either party may move for judgment as a matter of law. "If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R.Civ.P. 50(b). In ruling on a renewed motion for judgment as a matter of law pursuant to Rule 50(b), the Court may "(A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law." Fed.R.Civ.P. 50(b)(1). Further, in considering the post-verdict renewed motion for judgment as a matter of law, the trial court is:

> (1) to consider the evidence in the light most favorable to the ... parties prevailing with the jury; (2) to assume that all conflicts in the evidence were resolved ... in favor of the prevailing parties; (3) to assume as proved all facts which the prevailing parties' evidence tends to prove; (4) to give the prevailing parties the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to deny the motion if, reviewing the evidence in

this light, reasonable men could differ as to the conclusion to be drawn from it. *Voegeli v. Lewis,* 568 F.2d 89, 92 (8th Cir.1977) (quoting *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 857 (8th Cir. 1975)). Accordingly, the Court must focus its analysis on "whether or not the record contains evidence sufficient to support the jury's verdict." *Children's Broad. Corp. v. Walt Disney Co.,* 357 F.3d 860, 863 (8th Cir.2004).

" 'Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining [the prevailing party's] position.' " *Id.* (quoting *Racicky v. Farmland Indus., Inc.,* 328 F.3d 389, 393 (8th Cir.2003)); *see also Top of Iowa Co-op. v. Schewe,* 324 F.3d 627, 633 (8th Cir. 2003) (" 'Post-verdict judgment as a matter of law is appropriate only where the evidence is entirely insufficient to support the verdict.' ") (quoting *Belk v. City of Eldon,* 228 F.3d 872, 878 (8th Cir.2000)). In making this evaluation, the Court must be mindful that " '[a] mere scintilla of evidence is inadequate to support a verdict,' and judgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict." *Clark v. Kansas City Missouri Sch. Dist.,* 375 F.3d 698, 701 (8th Cir.2004) (quoting *Larson v. Miller,* 76 F.3d 1446, 1452 (8th Cir.1996) (en banc)).

### B. *Motion for New Trial*

Federal Rule of Civil Procedure 59 provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59. The power to grant a new trial "is confided almost entirely to

the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). This discretion must be supported by sufficient cause, however, because "[a] litigant is entitled to a fair trial, but only one." *Jones v. Iowa State Highway Comm'n,* 185 N.W.2d 746 (Iowa 1971). In exercising its discretionary power to grant a new trial, the role and function of the jury is not to be trivialized. "The district court can only disturb a jury verdict to prevent a miscarriage of justice." *Beckman v. Mayo Found.,* 804 F.2d 435, 439 (8th Cir.1986) (citing *McGee v. S. Pemiscot Sch. Dist. R–V,* 712 F.2d 339, 344 (8th Cir.1983)).

Since this country's inception, an individual's right to trial by jury, in both civil and criminal matters has been held to be of the utmost importance. Indeed, the Seventh Amendment specifically provides that "the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States," except according to the rules of the common law. U.S. Const. amend. VII. The jury is the traditional finder of facts in a trial, and as such, the " 'judge may not usurp the functions of the jury ... [which] weighs the evidence and credibility of witnesses.' " *White v. Pence,* 961 F.2d 776, 780–81 (8th Cir.1992) (quoting *McGee,* 712 F.2d at 344). The distinct roles between the court and the jury must be recognized and followed. For example:

> Whether the evidence, when offered, is admissible, is a question for the court; but when admitted, the question whether sufficient or not is for the jury, and it is their province to draw from it all such inferences and conclusions as it conduces to prove, and which, in their judgment, it does prove, and their finding is conclusive, unless a new trial is awarded by the court in which the case is tried,

or in the appellate tribunal, for some error of law.

*Barreda v. Silsbee,* 62 U.S. 146, 167, 21 How. 146, 16 L.Ed. 86 (1858). The respect for the jury system is such that the court "will not disturb a jury's verdict unless [it] determine[s] that no reasonable juror could have found for the non-moving party based on the trial record." *Sanders v. May Dep't Stores Co.,* 315 F.3d 940, 943 (8th Cir.2003) (citing *Moring v. Arkansas Dep't of Corr.,* 243 F.3d 452, 455 (8th Cir. 2001)).

It follows, then, that a motion for new trial cannot be granted simply because the trial judge disagrees with the jury's reasoning. "Where reasonable men can differ in evaluation of credible evidence, a new trial on the ground of weight of the evidence should not be granted." *White,* 961 F.2d at 781. At the onset, "[i]t must be assumed that the facts of the case have been correctly found by the jury." *Barreda,* 62 U.S. at 166, 62 U.S. 146.

> It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.

*Lavender v. Kurn,* 327 U.S. 645, 652, 66 S.Ct. 740, 90 L.Ed. 916 (1946). A jury's verdict is less likely to be unreasonable where the evidence presented at trial is

not complicated and the legal principles involved are not likely to confuse a jury. *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179, 187 (8th Cir. 1972) (citing *O'Neil v. W.R. Grace & Co.,* 410 F.2d 908, 913 (5th Cir.1969); *Lewin v. Metropolitan Life Ins. Co.,* 394 F.2d 608, 614–15 (3rd Cir.1968); *Cities Service Oil Co. v. Launey,* 403 F.2d 537 (1968)); *see also Latino v. Kaizer,* 58 F.3d 310, 314 (7th Cir.1995) (ruling that jury verdicts in cases with highly disputed facts and simple issues are given greater deference). However, "[r]egardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred." *Fireman's Fund,* 466 F.2d at 187. A miscarriage of justice only occurs when, based on the admitted evidence, the jury returns a verdict that is clearly not supported by the evidence.

### C. *Motion for Remittitur*

 Following trial, the Court may reduce a jury's damages award if it finds that the award is so excessive to be deemed "monstrous" or "shocking." *Thorne v. Welk Inv., Inc.,* 197 F.3d 1205, 1211 (8th Cir.1999) (quoting *Jenkins v. McLean Hotels, Inc.,* 859 F.2d 598, 600 (8th Cir.1988)); *see also Ouachita Nat'l Bank v. Tosco Corp.,* 716 F.2d 485, 488 (8th Cir.1983) ("A trial court should grant remittitur only when the verdict is 'so grossly excessive as to shock the conscience of [the] court.' ") (quoting *Drotzmanns, Inc. v. McGraw–Hill, Inc.,* 500 F.2d 830, 835 (8th Cir.1974)). "The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts." *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1049 (8th Cir.2002) (quoting *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1331 (11th Cir.1999) (emphasis in original)). Where, however, the Court

reduces an award in conformity with constitutional limits, there is no remittitur. *Id.* " 'A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages.... A constitutional reduction, on the other hand, is a determination that the law does not permit the award.' " *Id.* (quoting *Johansen,* 170 F.3d at 1331). Thus, remittitur is "discretionary with the court" while a reduction for constitutional purposes is mandatory. *Id.*

### D. *Motion to Alter or Amend Judgment*

Federal Rule of Civil Procedure 59(e) provides: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of judgment." Fed. R.Civ.P. 59(e). Rule 59(e) motions are appropriate where they involve reconsideration of matters properly encompassed in the decision on the merits. *See White v. New Hampshire Dep't of Employ. Sec.,* 455 U.S. 445, 451, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). Generally, altering or amending the judgment is appropriate where there is an intervening change in the law, where there is a need to reflect new evidence not available at the time of trial, to correct a clear legal error, or to prevent manifest injustice. *See Innovative Home Health Care, Inc. v. P.T.-O.T. Assoc. of the Black Hills,* 141 F.3d 1284, 1286 (8th Cir.1998).

## IV. LAW AND ANALYSIS

### A. *Bad Faith*

 Under Iowa law, an employee may sue an employer or the employer's workers' compensation carrier for a "bad faith" refusal or delay in the payment of benefits. *McIlravy v. N. River Ins. Co.,* 653 N.W.2d 323, 329 (Iowa 2002). A claim for first-party bad faith arises from " 'the knowing failure to exercise an honest and

informed judgment' on the part of a defendant from whom the employee seeks compensation due to work-related injuries." *Id.* (quoting *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990)). In order to prevail in a claim for bad faith, the insured party must prove by substantial evidence: "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.,* 642 N.W.2d 648, 657 (Iowa 2002)); *see also Seastrom v. Farm Bureau Life Ins. Co.,* 601 N.W.2d 339, 346 (Iowa 1999). The first element is objective, and the second element is subjective. *See Bellville v. Farm Bureau Mut. Ins. Co.,* 702 N.W.2d 468, 473 (Iowa 2005).

█ In considering bad faith tort cases against insurers, the Iowa Supreme Court has held that "[a] reasonable basis to deny a claim exists when the claim is fairly debatable." *See Wetherbee v. Economy Fire & Cas. Co.,* 508 N.W.2d 657, 662 (Iowa 1993). Whether a claim is fairly debatable is generally a question of law. *Id.; see also Bellville,* 702 N.W.2d at 473. "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct." *Bellville,* 702 N.W.2d at 473. In essence, then, the "fairly debatable" test requires a plaintiff "to establish to the satisfaction of a reasonable fact finder that [the defendants'] decision . . . was not based on an honest and informed judgment." *Nassen v. Nat'l States Ins. Co.,* 494 N.W.2d 231, 236 (Iowa 1992).

### 1. *Bellville standard.*

It has long been established in general first-party bad faith claims that if an in-

jured worker's claim is "fairly debatable," the court *may* grant judgment as a matter of law in favor of the insurer. *See, e.g., Wetherbee,* 508 N.W.2d at 662 ("Whether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law."); *Reuter v. State Farm Mut. Auto. Ins. Co., Inc.,* 469 N.W.2d 250, 254 (Iowa 1991) ("If an objectively reasonable basis for denial of a claim actually exists, the insurer, as a matter of law, cannot be held liable for bad faith."). Defendants urge, as they have previously, that the *Bellville* court provided the most detailed formulation of the standard for determining when a claim is fairly debatable, holding that, "if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable." *Bellville,* 702 N.W.2d at 473. According to Defendants, they are entitled to judgment as a matter of law in the present case because reasonable minds could differ on the compensability-determining fact, that is, on whether Plaintiff suffered a work-related injury on June 1, 1999.

Defendants argue that this Court's discussion of *Bellville* in its ruling on the parties' motions for summary judgment discounted the quoted *Bellville* language above due to other language in *Bellville* stating that "if it is undisputed that evidence existed creating a genuine dispute as to [a coverage-determining issue] a court can *almost always* decide that the claim was fairly debatable as a matter of law." Defs.' Br. at 38. According to Defendants, *Bellville* established a strict directed verdict rule and this Court improperly read *Bellville* as reaffirming the Iowa Supreme Court's rejection of such a rule in *Reuter v. State Farm Mutual Automobile Insurance Co., Inc.,* 469 N.W.2d 250 (Iowa 1991). Defendants urge that *Bellville* supports the application of a "modified" directed verdict rule in bad faith cases such

as this one, and that had the Court considered the authorities cited in *Bellville*, it would have understood that there are only certain circumstances which justify an exception to this newly created directed verdict rule, and that none of those circumstances are applicable to the present case.

The Court has reviewed the citations contained within *Bellville*, particularly the citation to the Ashley article emphasized by Defendants. *See Bellville*, 702 N.W.2d at 474 (quoting Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5–17 to 5–18 (2d ed.1997) (hereinafter "Ashley Article") ("[A]n insurer is innocent of bad faith as a matter of law . . . if the insurer took a position in regard to the claim that reasonable minds could hold. Unless the trial court is prepared to grant a directed verdict to the insured on his claim under the policy and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds. Therefore, the insurer should be entitled to a directed verdict in its favor on the insured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim.")). The quoted Ashley passage discusses the directed verdict rule, adhered to by "many jurisdictions." Ashley Article at § 5:4. The article also discusses exceptions to the rule that a directed verdict must be granted in favor of one side or the other, such as when the insurer presents false testimony, or intentionally collects just enough evidence to deny a claim. *Id.* Even assuming that none of the exceptions discussed in the Ashley article are applicable to the present case, however, the fact remains that the *Bellville* court did not explicitly adopt the directed verdict rule and never indicated an intent to depart from its prior law on the issue. Indeed, the plain language of the *Bellville* decision,

just prior to the Ashley quotation, states that "[w]hether a claim is fairly debatable can *generally* be decided as a matter of law by the court." *Bellville*, 702 N.W.2d at 473. Moreover, in the two years since *Bellville* was decided, the Court cannot find one Iowa case interpreting *Bellville* in the way urged by Defendants. The Court has thoroughly reviewed this issue in its prior ruling on the parties' motions for summary judgment and incorporates its reasoning and discussion of the matter herein. *See* Order at 39 (Clerk's No. 109) ("[T]he Court finds it likely that had the Iowa Supreme Court intended such a sweeping change, it would have made the change explicitly, as the effect of Defendants' interpretation would be to virtually exclude the possibility of trial by jury in every first-party bad faith tort claim.").

### 2. Was Plaintiff's June 1, 1999 claim fairly debatable as a matter of law?

■ At the summary judgment stage of these proceedings, and during trial, Defendants argued that there could be no liability in this case because Plaintiff "never tendered his workers' compensation claim as a material aggravation of a pre-existing condition. . . . When Plaintiff Zimmer submitted his 06/01/99 DOL claim, he submitted it as a new injury." Defs.' Resistance to Pl.'s Mot. for Partial Summ. J. at 2. The Court found this position to be without merit, in light of the "well-established principle in workmen's compensation law if a claimant had a preexisting condition or disability, aggravated, accelerated, worsened or 'lighted up' by an injury which arose out of and in the course of employment resulting in a disability found to exist, he would accordingly be entitled to compensation." Order at 43 (Clerk's No. 109, quoting *Dep't of Transp. v. Van Cannon*, 459 N.W.2d 900, 904 (Iowa Ct.App. 1990)). Defendants now argue that, at all

times, Plaintiff's claim was properly denied because it was always fairly debatable whether Plaintiff was physically injured at all on June 1, 1999.

Plaintiff argues that Defendants never claimed that the basis for denying Plaintiff's claim was a question as to whether he had actually sustained an injury on June 1, 1999, and that Defendants' argument is prohibited as a result. The Court is inclined to agree. At no stage of these proceedings, prior to the present motion, have Defendants ever adopted such a position. Defendants, however, insist that the fact that Beerbower's denial letter stated that the "medical records do not support your *alleged* injury" demonstrates that Defendants questioned whether the injury had occurred or not. Moreover, Defendants point out that Beerbower's claims notes discuss a lack of corroboration that Plaintiff had suffered an injury to his back. Notably, however, the claims notes discuss whether there is corroboration of an observable *injury* to Plaintiff's back, not whether Plaintiff suffered an actual physical trauma on June 1, 1999. Even assuming, however, that Defendants did properly raise the question of whether Plaintiff was injured on June 1, 1999, judgment as a matter of law is unwarranted.

Defendants point to the following facts in support of their contention that, at all times, there was an objectively debatable issue as to whether the June 1, 1999 injury actually occurred: 1) Tim Enos failed to corroborate Plaintiff's account; 2) emergency room records report Plaintiff denied any fall or injury; 3) emergency room records and Dr. Rettenmaier's records did not have any reference to a June 1, 1999 injury; 4) Dr. Horner's records lacked any contemporaneous reference to the June 1, 1999 injury.

In notes articulating her basis for denying Plaintiff's workers' compensation claim on August 3, 1999, Tina Beerbower stated: "Claim is denied. IW has not overcome the burden of proof. IW had indicated that he [ ] went to DMGH ER for his back, however nothing in the ER notes indicates this. Also IW had treated for his back about 3–5 days prior to the alleged incident. I also talked with the gentleman that was suppose[d] to have witnessed the incident. He did not confirm that this IW had hurt his back at work." Trial Ex. J–15. At the time Beerbower made this determination, she was aware that Plaintiff had told his supervisor, Dennis Wollums, that he hurt his back, and that Wollums had stated "he walks like he does any other time he has a bad back." Beerbower had also spoken with Plaintiff himself, and noted in the claim notes that Plaintiff told her he has suffered from "continued back pain," but "that his back is really hurting him now." Beerbower also wrote that Plaintiff "kept saying over and over that this was the final straw that broke the camel's back." Trial Ex. J–7. On June 11, 1999, Beerbower contacted Tim Enos, who confirmed he had witnessed Plaintiff picking up papers blowing around, but that Plaintiff "did not inform him that he had hurt his back." Beerbower had also collected the following medical records:

(1) Dr. McGuire's March 24, 1999 report, stating that Plaintiff's MRI was "pretty reasonable looking," but that Plaintiff had suffered a "recent worsening of back and leg complaints, etiology unknown";

(2) Dr. Igram's May 17, 1999 report, articulating Plaintiff's back problems and surgical history;

(3) Dr. Stein's May 28, 1999 report noting that Plaintiff "is being seen today for chronic low back and leg pain." Dr. Stein also stated that Plaintiff's "gait was a little bizarre," "the MRI shows some degenerative

disease at the L–5 S–1 level," and his belief that "a lot of his problems are more on an emotional basis than on a physical basis";

(4) Dr. Abbasi's Emergency Room notes from DMGH stating under "past medical history" that Plaintiff "is remarkable for back problems." Dr. Abbasi stated that Plaintiff complained of discoloration and tingling in his fingers, but "denied any falls or injury. . . . He does complain of back pain, which is chronic in nature." Dr. Abbasi also stated that he notified Dr. Horner and she "present[ed] to the Emergency Room to assume care of" Plaintiff;

(5) Dr. Rettenmaier's notes, dated June 3, 1999, stating that Plaintiff was seen on referral from Dr. Horner for "evaluation [of a] variety of pain issues" that had improved since his surgery, but developed into "some other pain issues" about 2½ years before, including "progressive worsening" since January 1999. "He talks about low back pain that has been unmanageable. In the past, it has always been manage[able], but has subsequently been unmanageable. . . ." Plaintiff appeared "anxious" at his exam with Dr. Rettenmaier; "he had great difficulty bearing weight on his left leg. . . . He did appear to move to the right side to take weight off his left side. He obviously had difficulty getting up to the exam table. I had to help him. He hobbles on his left leg. He has difficulty weight bearing from what presumed to be his pain. . . . He has no classic findings of full blown dystrophy in the sense of swollen, edematous phase hands and touch-me-not type symptoms. . . . He could not stand on his tiptoes. How much was pain and giveaway weakness, I could not tell. He had somewhat of a forward hunched appearance. . . ." Dr. Rettenmaier stated his belief that Plaintiff suffered from "Chronic Pain Syndrome" and suggested "it would certainly be reasonable to pursue studies such as a three phase bone scan and EMG and nerve conduction velocities of his left arm and left leg . . . ."; and

(6) Dr. McGuire's June 14, 1999 report stating that Plaintiff "had an incident approximately 6/1/99" and that "his pain is [now] worse." Dr. McGuire noted that Plaintiff "gets up with real difficulty . . . his spine is almost kyphotic in the lumbar spine, he moves about the room in a very awkward manner." Dr. McGuire stated that "as far as the back is concerned he could be working. The psychological problems and the job conflict situation would probably prevent him from working."

Beerbower did not have any notes from Dr. Horner, Plaintiff's primary treating physician, either regarding his underlying back or emotional problems, or from the emergency room visit following the June 1, 1999 injury. Beerbower admits that she did not analyze Plaintiff's claim as one for material aggravation of a pre-existing injury or for the possibility of any mental health claims. Rather, she examined the submission of Plaintiff's workers' compensation claim strictly as one for a "new injury." Beerbower also admits that, though she had asked for a causation letter from Dr. McGuire, she had not received one on the date Plaintiff's claim was first denied.

Defendants argue that Plaintiff only claimed a back injury, but that his actual

injuries were psychological. Regardless, according to Defendants, he needed to show a back injury to obtain compensation. Iowa law, at the time Beerbower first adjusted Plaintiff's claim, supports this proposition, holding that to recover for mental injuries based on a physical trauma, the claimant must have suffered an actual physical trauma.[4] *Newman v. John Deere Ottumwa Works of Deere & Co.,* 372 N.W.2d 199, 202–03 (Iowa 1985) ("If the physical trauma was imaginary it can form no basis for recovery....").[5] Thus, according to Defendants, the decision to deny Plaintiff's claim was entirely reasonable because there was no corroboration of his injury.

Viewing the evidence in the light most favorable to Plaintiff, as the Court must on the present motion, Defendants position is unconvincing. First, Defendants' contention that there was simply no corroboration of Plaintiff's injury at the time his claim was denied is without merit. Plaintiff had personally told both his supervisor and Beerbower of his injury. He also claims to have told Tim Enos. While Enos did not remember Plaintiff stating he had been hurt, Enos did confirm all of the circumstances that Plaintiff identified as leading up to his injury. The emergency room notes from June 2, 1999 clearly state that Plaintiff was complaining of back pain, though they also pointed out that the back pain was chronic in nature. Given the medical records that Defendants had in their possession about Plaintiff's prior back problems, this statement in the emergency room notes is no great surprise. Dr. McGuire's June 14, 1999 report referenced the work-related injury and the worsening of Plaintiff's back pain. Additionally, Dr. Horner's notes, which Beerbower requested but had not received before denying Plaintiff's claim, indicated as Plaintiff's chief complaint "severe back pain. Chronic since yesterday." Dr. Horner's notes are dated June 2, 1999, the day following the claimed work-related injury. Dr. Horner's records in the following month showed that Plaintiff was taken off work indefinitely, was told to consult with various doctors, and noted that Plaintiff's back pain was severe since the time of his emergency room visit.[6] Dr. Leth's records, dated July 12, 1999, also note that his back problems may have been exacerbated by the June 1, 1999 incident. And on June 8, 1999, Plaintiff told Dr. Koithan that he had injured his back at work and had been off work.

The Court finds Defendants' claim that it was fairly debatable whether Plaintiff ever suffered an injury on June 1, 1999 to be much like the basis for denial proffered,

---

4. This is in contrast to the so called "mental-mental" claim where no distinct trauma (such as Plaintiff's back injury in this case) precipitates a mental injury. Indeed, a "mental-mental" injury, that is, a mental injury that does not arise out of a discrete traumatic event, is compensable if the claimant can demonstrate that it was "caused by unusual stress in the work environment." *Dunlavey v. Economy Fire & Cas. Co.,* 526 N.W.2d 845, 853 (Iowa 1995).

5. Notably, nothing in Iowa law requires that the underlying physical trauma be compensable for the subsequent mental injuries to be compensable.

6. Dr. Horner's July 27, 1999 appointment notes discuss the June 1, 1999 injury and recount that Plaintiff "had to leave work later that morning ... due to the pain in his back. The next day he went to the Des Moines General emergency room where I saw and evaluated him." Despite this information, Beerbower made no further effort to clarify whether Plaintiff's back injury on June 1, 1999 caused his complaints or materially exacerbated his preexisting back or emotional problems.

and ultimately rejected as unreasonable, in *Etten v. United States Food Service, Inc.,* 446 F.Supp.2d 968 (N.D.Iowa 2006). In *Etten,* the plaintiff slipped and fell on ice while making a work-related delivery on February 28, 2003. 446 F.Supp.2d at 971. The plaintiff did not think his injury was serious, but by the weekend, his pain had become progressively worse. *Id.* at 971–72. In the coming weeks, plaintiff's pain became even worse, and by March. 22, 2003, he was unable to stand, sleep, or move. *Id.* at 972. A few days later, an MRI revealed a herniated disc in plaintiff's back. *Id.* The plaintiff suffered another fall at work on April 3, 2003. After this fall, he went to a surgeon regarding his herniated disc and underwent surgery within a day. *Id.* at 972–73. The plaintiff did not report the first fall to his employer until March 23, 2003, but reported the second fall the same day it occurred. *Id.* at 973. Plaintiff's claim for workers' compensation benefits was denied. *Id.* The claims adjuster noted that Plaintiff did not report the first fall to his employer right away and that he reported to one of his medical providers on March 24, 2003 that he was "good until 2 days ago." *Id.* The claims adjuster opined that, because the plaintiff did not work on March 22, 2003, his back injuries were non-work related. *Id.* The district court found that a reasonable jury could find that plaintiff's claims for workers' compensation benefits were not fairly debatable. *Id.* at 976. Specifically, the court found that nothing in the treatment notes provided medical evidence that the plaintiff did *not* suffer a herniated disc on the date of his first fall and that the defendant had no evidence that plaintiff's injuries stemmed from another occurrence. *Id.*

In the present case, a reasonable jury could have concluded that Defendants' claims that Plaintiff did not suffer a work related injury on June 1, 1999 are based "purely on speculative inferences from a highly selective reading of Plaintiff's medical records." *Id.* at 977. As noted, the medical records, while not specifically stating that an injury on June 1, 1999 was the cause of Plaintiff's problems, do indicate a likelihood that something occurred on that date. Further, later medical records clearly linked Plaintiff's injuries to a June 1, 1999 incident, yet Defendants continued to deny his claim even in the face of that later evidence that the injury occurred. While true that the only real source of information about the injury is the Plaintiff himself, the Court is not aware of any requirement that a workers' compensation claimant have witnesses to the actual injury to recoup benefits. A reasonable jury could have found that the information known to Beerbower at the time she denied the claim, and certainly the further information known at later points in the claims process, prohibited a finding that the denial decision was reasonable. Essentially, the Court concludes that the evidence in this case, specifically the evidence of non-injury asserted by the Defendants, is subject to more than one inference, prohibiting judgment as a matter of law in favor of Defendants on the question of whether an objectively reasonable basis existed for denying Plaintiff's claim. *See McIlravy,* 653 N.W.2d at 333 ("The reasonableness of the denial of a workers' compensation claim by an insurer is a question of law only when the evidence is undisputed and only one inference can be drawn from the evidence. The facts of this case were undisputed, but the inferences were not.").

Further, a reasonable jury could have concluded that Defendants failed to act reasonably in evaluating Plaintiff's claim when they continued to deny Plaintiff's claim after August 3, 1999, despite receiving additional medical documentation.

Plaintiff "tendered" an injury claim to his employer, triggering a duty by the workers' compensation carrier to act reasonably in regards to his claim. The duty to act reasonably is an affirmative one, and "includes the duty to fully and fairly investigate a claim rather than to stand back and deny a claim simply because they wish to deny it." *See Pickering v. Squealer Feeds*, No. 99–0295, 2000 WL 961920, at *8 (Iowa Ct.App. July 12, 2000) (citation omitted). On the record established at trial, there was more than sufficient evidence from which a jury could conclude that Defendants did not fully and fairly investigate Plaintiff's claims. Defendants ignored viable bases upon which Plaintiff could legally be entitled to benefits and now claim to have believed that Plaintiff was never really injured on June 1, 1999, despite Plaintiff's own testimony that he was injured and substantial evidence that can be viewed as corroborative of that injury. Add to this the fact that Defendants did not have in its possession all relevant documents, most notably Dr. Horner's medical records regarding Plaintiff's emergency room visit, wherein she indicated that his pain was worse in his back since the previous day, it is clear that the Court cannot say as a matter of law that Plaintiff's claim was fairly debatable at the time Defendants denied it on August 3, 1999, or at other times of denial later in the parties' interactions.

Moreover, even assuming that Beerbower actually had a reasonable basis for doubting that a work-related injury occurred on June 1, 1999 when she denied Plaintiff's workers' compensation claim on August 3, 1999, there are clearly additional factual questions regarding the viability of that position at later points in time. While a claim may be fairly debatable at one point in time, if the insurer becomes aware at a later date that the claim is no longer fairly debatable, liability for bad faith may still be imposed. *See Squealer Feeds v. Pickering*, 530 N.W.2d 678, 683 (Iowa 1995) ("In other words, a continued delay in payment may be unreasonable even though the original denial was not. . . . Any documents showing new information coming to the attention of [the insurer] after its denial would be relevant to whether it was reasonable for the company to persist in its denial of benefits.") (abrogated on other grounds); *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991) ("The more difficult question is whether, at some later date, [the insurer] became aware there was no reasonable basis to continue denying plaintiffs' claim. . . .").

In the present case, Defendants received Dr. Horner's notes of Plaintiff's emergency room visit on August 20, 1999. Beerbower did not enter Dr. Horner's notes into the claim system and did not reopen Plaintiff's file to determine if Dr. Horner's records made continued denial appropriate. Indeed, Dr. Horner's records showed that Plaintiff was taken off work indefinitely, was told to consult with various doctors, and noted that Plaintiff's back pain was severe since the time of his emergency room visit. Contrary to Defendants' assertion that "nothing in Dr. Horner's records causally connected the back pain to a June 1 incident," Dr. Horner's July 27, 1999 appointment notes discuss the June 1, 1999 injury and recount that Plaintiff "had to leave work later that morning . . . due to the pain in his back. The next day he went to the Des Moines General emergency room where I saw and evaluated him." Despite this information from Dr. Horner, Tim Enos' confirmation that Plaintiff had bent over to pick up papers, Plaintiff's own version of events, Plaintiff's report to his supervisor that he suffered an injury, and the supervisor's confirmation of Plaintiff's report and statement that Plaintiff was

walking as he usually did when he has a bad back, Beerbower made no further effort to clarify whether Plaintiff's back injury on June 1, 1999 caused his complaints or materially exacerbated his preexisting back or emotional problems.

### 3. *Penalty benefits.*

 Defendants next argue that Plaintiff's claim for bad faith denial of workers' compensation benefits is barred because Plaintiff never pursued an award of penalty benefits in the underlying workers' compensation case. This Court has exhaustively addressed this issue previously, both in its ruling on the parties' Motions for Summary Judgment (*see* Order, Clerk's No. 109), and in a ruling on the Defendants' Motions in Limine (*see* Order, Clerk's No. 149). In both Orders, which the Court incorporates herein by reference, the Court found nothing in Iowa law or in the plain language of Iowa's Workers' Compensation Act that would "indicate even a likelihood, let alone a probability, that any requirement exists that penalty benefits must be sought prior to a suit for bad faith." Clerk's No. 109 at 35; Clerk's No. 149 at 12. Moreover, the Court found that if the Iowa legislature intended to require workers' compensation claimants to file a claim for penalty benefits before filing a bad faith tort action, the legislature easily could have included such a requirement in the statute.

The only argument that Defendants make that differs from prior arguments on the issue is a contention that *Reedy v. White Consolidated Industries, Inc.*, 503 N.W.2d 601, 603–04 (Iowa 1993) held "that bad faith suits are unripe and should be stayed until all preliminary issues cognizable in the workers' compensation proceeding had been resolved." Defs.' Br. at 54. In *Reedy*, the United States District Court for the Northern District of Iowa certified to the Iowa Supreme Court the question of whether an employee must first litigate his workers' compensation claim before the Iowa Industrial Commission and exhaust all appeals before a bad faith action is ripe for adjudication. 503 N.W.2d at 602. In responding to the certified question, the Iowa Supreme Court found that the statutory exhaustion-of-remedy doctrine for review of agency action in Iowa Code § 17A.19(1) (1993) did not apply to bad faith workers' compensation claims. *Id.* The court further found that doctrine of primary jurisdiction was not directly applicable because the "industrial commissioner has no jurisdiction to determine the type of claim on which the action is based [bad faith]." *Id.* It stated:

> Nonetheless, [the Iowa Industrial Commission] has jurisdiction to settle important factual questions that may have a direct bearing on the bad-faith claim. In our view, it would be clearly preferable to have the extent of the defending party's liability for such payments determined in the first instance by the administrative agency entrusted with the administration of the Iowa workers' compensation laws. Moreover, we believe that decisions made through this administrative process that are relevant to the issues in the bad-faith action will, in many instances, carry preclusive effect under the principles we recognized in *Board of Supervisors v. Chicago & North Western Transportation Co.*, 260 N.W.2d 813, 815 (Iowa 1977).
>
> We believe, however, that, within the context of a bad-faith tort claim based on failure to provide workers' compensation benefits, the goal of having material issues of benefit entitlement decided in the first instance by the industrial commissioner is best handled through a discretionary abstention policy that operates to delay the consideration of those issues by a court. Cases filed prior to

the completion of the administrative process should not be routinely dismissed on ripeness grounds. That is a circumstance that should encourage courts, whenever it is feasible to do so, to permit the case to remain on the docket while awaiting the administrative determination. We so answer the ... certified question.

*Id.* at 603–04.

The Court sees nothing in *Reedy* that compels a conclusion that a bad faith suit is "unripe" simply because a claimant opted not to pursue penalty benefits. Indeed, the *Reedy* decision encourages federal courts to stay bad faith workers' compensation claims "while awaiting the administrative determination," and presumably any appeals thereof. In the present case, an administrative determination on the compensability of Plaintiff's workers' compensation claim was made, and the appeals of that administrative determination were fully exhausted. While true that the failure to present a claim for penalty benefits during the administrative proceeding forever bars such a claim, *see Gentry v. Albers*, No. 5001488, 2004 WL 1467257, at *17 (Iowa Workers' Comp. Comm'n Apr. 29, 2004), *Reedy* simply does not support Defendants' contention that a plaintiff *must* pursue penalty benefits prior to making a bad faith claim, particularly in light of the Iowa Supreme Court's recognition that penalty benefits and bad faith tort recovery constitute "two distinct methods by which a ... workers' compensation carrier may be penalized due to their delay in payment of workers' compensation benefits." *McIlravy*, 653 N.W.2d at 328.

### B. *Punitive Damages*

1. *Clear and convincing evidence of culpability necessary for punitive damages.*

Defendants urge that, even if the Court concludes that they are not entitled to judgment on the assertion that whether Plaintiff was injured on June 1, 1999 was fairly debatable, the evidence presented at trial supports a finding that Defendants' actions in wrongfully denying Plaintiff's claims amounted to nothing more than negligent conduct. More specifically, Defendants claim that their conduct, even viewed in the light most favorable to Plaintiff, did not rise to the level necessary to support the verdict of punitive damages rendered by the jury.

 Under Iowa law, punitive damages may be imposed to punish the defendant's willful and wanton conduct and to deter the defendant, or others, from repeating such conduct in the future. *See Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 407 (Iowa 2001). In order to obtain punitive damages, the plaintiff must prove, by a preponderance of clear, convincing, and satisfactory evidence, that "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." *Id.; see also* Iowa Code § 668A.1(1)(a); *Schooley v. Orkin Extermination, Co.*, 502 F.3d 759, 766 (8th Cir.2007) (finding punitive damages appropriate where a defendant's conduct "'amounted to a willful and wanton disregard for the rights of another'" (citation omitted)). The Iowa Supreme Court has defined "willful and wanton" as meaning that: "the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 395 (Iowa 2001) (citations omitted); *see also Schooley*, 502 F.3d at 766 (applying the same standard employed in *Gibson*). Moreover, a plaintiff seeking to establish

that conduct was willful and wanton must demonstrate that the defendant's conduct constituted actual or legal malice. *Id.* at 396. "Actual malice is characterized by such factors as personal spite, hatred, or ill will," while "[l]egal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.* (citations omitted). Under these standards, a plaintiff seeking punitive damages must demonstrate something more than negligence on the part of the defendant. *Id.*

■ At trial, Plaintiff did not present any evidence that Defendants' conduct in denying and in continuing to deny his workers' compensation claim was motivated by personal spite, hatred, or ill will. Accordingly, the Court must evaluate only whether Plaintiff presented sufficient evidence to support a finding of legal malice. *See Gibson,* 621 N.W.2d at 397; *see also Schooley,* 502 F.3d at 766 (" 'To establish legal malice it need only be shown that wrongful or illegal conduct was committed or continued with a reckless disregard [of] another's rights.' ") (quoting *Kimmel v. Iowa Realty Co., Inc.,* 339 N.W.2d 374, 384 (Iowa 1983)). Defendants argue that any right to payment that Plaintiff was entitled to was at least partially obscured by the confusion over his pre-existing conditions and questions about the extent to which the June 1, 1999 injury actually was a cause of Plaintiff's problems. Defendants point out that Plaintiff's own expert, Paul Amoruso, testified that he did not think that "Travelers was maliciously vicious in trying to pick on [Plaintiff], but those people made some major mistakes...." Indeed, Amoruso testified that he believed that Beerbower and Crawford evaluated Plaintiff's claim with tunnel vision, focusing on certain "aspect[s] of the claim and individual sentences picked out of medical treatment." These factors, Defendants ar-

gue, give rise to the conclusion that Defendants' conduct was, at worst, merely negligent, and thus not a proper basis for a punitive damage award.

As discussed *supra,* the evidence in this case was sufficient to permit a jury inference that there was no reasonable basis for the denial of Plaintiff's claim, and that Defendants knew or had reason to know that there was no reasonable basis for denying, or for continuing to deny Plaintiff's workers' compensation claim. Beerbower's testimony revealed that she was aware of the concept of material aggravation of preexisting conditions and that she was aware that Plaintiff had a preexisting back condition. Indeed, Plaintiff told Beerbower during their interview about his prior back surgery and stated repeatedly that the June 1, 1999 incident was the "straw that broke the camel's back." Beerbower, however, denied Plaintiff's claim without ever considering material aggravation as a basis for recovery because Plaintiff told her that his claim was for a new incident. Trial Tr. at 73–77.

Beerbower also declined to reevaluate the denial upon receipt of additional medical records, specifically, Dr. Horner's notes regarding her treatment of Plaintiff shortly after the June 1, 1999 incident. Paul Amoruso testified that Beerbower's failure to evaluate the claim as one for material aggravation of a preexisting condition constituted a major departure from good claims handling practices, as did Beerbower's failure to reevaluate the claim upon receipt of new medical records. Trial Tr. at 254–57. In fact, Amoruso specifically stated that he saw no evidence in the record that would make Plaintiff's claim deniable, "other than someone wanted to deny it, and she did." Trial Tr. at 254. Amoruso further took umbrage with the ratification of the denial of Plaintiff's claim by Beerbower's supervisor, Brian Nelson,

and by Chris Crawford's denial of Plaintiff's claim in August 2000. According to Amoruso, Crawford wrote in the claims file that he was going to review "all" of Plaintiff's medical records, but numerous medical records were never listed in the claim file notes. Trial Tr. at 272. This testimony gives rise to an inference that Crawford did not review all of Plaintiff's medical records, despite his statement to the contrary in the claims notes.

The law does not require an injured worker to make a legal determination about the proper basis on which he may recover workers' compensation benefits. *Niver*, 412 F.Supp.2d at 989 ("The onus is not on the injured worker to guess right about the basis on which his workers compensation claim might be paid; rather, the onus is on the workers compensation insurer to 'act reasonably in regard to benefit payments [even] in the absence of specific direction by the commissioner.'" (citation omitted)). On the evidence in the record presented at trial, a reasonable jury could fairly have concluded that Beerbower, Nelson, and later Crawford, knew or had reason to know that they had no reasonable basis for denying Plaintiff's workers' compensation claim and for continuing to deny the claim. Amoruso's testimony clearly supports an inference by the jury that Defendants failed to evaluate Plaintiff's claim in accordance with reasonable claims handling practices and that this departure was done intentionally. It is not unreasonable for the jury to have concluded that this act was done in disregard of Plaintiff's right to have his workers' compensation case appropriately and fairly considered, or that harm would be highly probable to result. The Court, accordingly, defers to the jury's conclusion on this issue. *See Schooley*, 502 F.3d at 766–67 (reinstating a jury's punitive damages award where there was sufficient evidence of legal malice).

### 2. *Vicarious Liability—Travelers*

Defendants next argue that Travelers had no insurance relationship or contract with Plaintiff, and thus cannot be subject to liability for either punitive or compensatory damages. Plaintiff disagrees, pointing out that evidence at trial unequivocally demonstrated that both Beerbower and Crawford were Traveler's employees who handled Plaintiff's claims in accordance with Traveler's policies, thus subjecting Travelers to liability under a theory of vicarious liability.

 "A claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship (or employment as an independent contractor), and proof that the injury occurred within the scope of that relationship." *Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 201 (Iowa 2007). Travelers owns CSS, the company hired to administer workers' compensation claims in this case. Trial Tr. at 628 (testimony of Brian Nelson). It is clear that, while CSS was the entity responsible for adjusting Plaintiff's claim, the CSS employees who actually adjusted the claim, Beerbower and Crawford, were employees of Travelers. Trial Tr. 749–50 (testimony of Crawford, stating that he and Beerbower were Travelers employees, even though the adjusting of Plaintiff's claim was done for CSS, and admitting that CSS and Travelers were basically "one and the same company"). It is equally clear that the bad faith denial of Plaintiff's workers' compensation claim by Beerbower and Crawford was done within the scope of their relationship with Travelers, as each was acting as a Travelers' employee at the time they denied Plaintiff's claim.

Defendants admit that Travelers is liable for torts committed by its employees within the scope of their employment. Defendants urge, however, that the mishandling of a workers' compensation claim *is* not tortious unless the party sought to be held responsible for the misconduct had an insuring relationship with the claimant. That is, Defendants argue that since Travelers had no insurance contract with Plaintiff, it cannot be liable, despite the fact that the elements for vicarious liability have been satisfied. Defendants cite *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), in support of this proposition. In *Gruenberg*, the plaintiff owned a lounge and restaurant which were insured against loss by three defendant insurers, Aetna Insurance Company, Yosemite Insurance Company, and American Home Assurance Company. 108 Cal.Rptr. 480, 510 P.2d at 1034. Following a fire, the insurers denied coverage and the plaintiff sued for breach of the implied duty of good faith and fair dealing. *Id.* at 1036. The court found the plaintiff's complaint against the insurance companies proper because inherent in the contracts of insurance was an implied duty of the defendants to act in good faith in the handling of any claim which might be filed by the plaintiff. *Id.* at 1037. The court dismissed the same claim by plaintiff against the insurance adjusting firm and its employees, however, pointing out that such persons were not parties to the contracts of insurance, and thus were not subject to the implied duty of good faith and fair dealing. *Id.* at 1039.

The Court finds *Gruenberg* distinguishable. In that case, the companies in an insuring relationship with the plaintiff were being held vicariously liable for the conduct of their employees' mishandling of plaintiff's claims. The court found that the employees who actually mishandled the claim were not individually liable to the plaintiff for breach of a duty of good faith and fair dealing because they personally had no contractual relationship with the plaintiff. Here, the parties concede that CSS, the third party administrator, did owe a duty of good faith to Plaintiff in regard to handling his claim. Travelers owns CSS and Travelers employees appear to have been farmed out to CSS to act under its contract to administer workers' compensation claims. On the evidence presented at trial, however, it appears that CSS is little more than a straw company, at least in the context of this case. Indeed, the evidence in the record supports a conclusion that CSS and Travelers are one and the same entity for purposes of the present action. Travelers cannot avoid vicarious liability that it would otherwise be subject to simply because it *claims* that Beerbower and Crawford worked for an independent company, particularly where, as here, there is no evidence to support the contention.

■ Having found that Travelers is vicariously liable in the present action, it is nonetheless clear that separate punitive damages awards against Travelers and CSS are impermissible. Generally, where there are two defendants, there can be two separate punitive damages award, one against each defendant for the purpose of punishing the individual defendant's wrongful conduct. *See Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925–26 (Iowa 1978). In the present action, however, Travelers is not alleged to have independently committed any wrong against Plaintiff. Rather, Travelers is a party to the action simply on the basis that it is vicariously liable for the actions of its employees, taken in the scope of their employment. *Id.* (applying the rule that only one punitive damages award is appropriate in the context of a piercing the corporate veil case). To sustain an independent pu-

nitive damage award against Travelers in this circumstance would undermine the very purpose of punitive damages. Accordingly, the Court sets aside the punitive damages award against Travelers in its entirety, *see id.* (adopting the same approach), and finds that Travelers is jointly and severally liable for the punitive damages awarded against Defendant CSS.

### 3. *CNA liability.*

■ Defendants next argue that CNA cannot be subject to punitive liability in this action. CNA contracted with Wells Fargo to provide workers compensation benefits to its employees, to the extent that such claims were in excess of $100,000. CNA then contracted with CSS to administer such claims. The contract between CNA and CSS provides that CSS would "[p]erform all acts and functions it deems necessary, appropriate and in accordance with the terms of this Agreement as well as applicable prudent insurance industry claims adjuster standards in investigating, administering, processing, negotiating, and settling of all Claims...." Pl.'s App. at 134.

As this Court instructed at trial:

A corporation can only act through its officers, employees, and agents. Thus, a corporation is liable for the wrongful acts of an employee, officer, or agent, if the acts are done in the scope of the employee, officer, or agent's employment.

An employee is a person bound by duty of service, subject to the employer's right to control or direct the manner in which the work shall be done.

Trial Final Inst. No. 9. Consistent with the Court's instructions to the jury on punitive damages, CNA can only be liable for punitive damages by reason of CSS's acts if one of the following occurred: "[CNA] authorized the act and the way it was done[;]" or "[CNA] ratified or approved the act." Trial Punitive Damages Inst. No. 5.

Plaintiff argues that there is sufficient evidence to find CNA liable under the above instructions, because CNA gave CSS a "blank check to adjust claims as CSS saw fit." Pl.'s Br. at 66. More specifically, Plaintiff claims:

CNA's agreement explicitly tells CSS to adjust claims in the manner that CSS determines is in accordance with CSS's view of "applicable prudent insurance industry claims adjustor standards in investigating, administering, processing, negotiating, and settling claims." This agreement gives CSS actual authority to adjust claims in any manner CSS deems appropriate. CSS's interpretation of those standards is exactly the manner in which Zimmer's claim was handled and the application of those standards resulted in the willful and wanton disregard of Zimmer's rights under the law.

Pl.'s Br. at 66–67.

Having reviewed the evidence and the arguments of the parties, the Court concludes that CNA did not authorize, ratify, or approve of CSS's handling of Plaintiff's workers' compensation claim and therefore, CNA cannot be held liable for punitive damages. The Court finds untenable Plaintiff's argument that CNA approved of or otherwise ratified CSS's tortious conduct by granting CSS the authority to "[p]erform all acts and functions it deems necessary, appropriate and in accordance with the terms of this Agreement as well as applicable prudent insurance industry claims adjuster standards in investigating, administering, processing, negotiating, and settling of all Claims...." While this language is inartful, it is clear that the contract provision is intended to give CSS discretionary authority to handle claims in accordance with its agreement with CNA

and in accordance with industry claims adjusting standards. Industry claims adjusting standards, though subject to some variance, are generally objective, as Plaintiff's own expert demonstrated at trial. Indeed, Plaintiff's expert testified that CSS did *not* follow industry claims adjusting standards when adjusting Plaintiff's workers' compensation claim. Plaintiff has offered no evidence that CNA ever took any action with regard to Plaintiff's workers' compensation claim, other than entering into a contract with CSS to administer it. This evidence is insufficient as a matter of law to sustain punitive damages against CNA. Accordingly, the punitive damage award against CNA is hereby vacated for want of evidence.

### C. Verdict and Damages

1. *Lost wages and loss of future earning capacity.*

a. *Judicial and collateral estoppel.*

The jury awarded Plaintiff $571,529 for past lost wages and $1,515,924 for loss of future earning capacity. Defendants contend that Plaintiff is judicially and collaterally estopped from receiving these two categories of damages. Specifically, Defendants argue that Plaintiff was permanently and totally disabled by his June 1, 1999 back injury, as determined before the Iowa Workers' Compensation Commissioner. In support of this argument, Defendants point out that the arbitration decision found that Plaintiff "has proved that the work injury on June 1, 1999, caused a permanent disability," and that "[w]hen all factors are considered, [Plaintiff] is currently permanently and totally disabled form the June 1, 1999 injury." Defs.' App. at 109–11. According to Defendants, this language establishes the law of the case, i.e., that Plaintiff was totally and permanently disabled as a result of his June 1, 1999 injury, thus meaning that any inappropriate handling of his workers compensation claim could not have caused him any further loss of wages or earning capacity.

Plaintiff counters that Defendants' argument misunderstands the actual holding of the arbitration decision, ignoring the fundamental concept that "any damages recovery can have more than one proximate cause." Pl.'s Br. at 67. Plaintiff argues that the Deputy Commissioner "did not determine that the June 1, 1999 [injury] was the sole proximate cause of the injury," but rather concluded that the injury on that date was a proximate cause of Plaintiff's permanent and total disability. Further, Plaintiff contends, the Deputy Commissioner did not conclude that Plaintiff was permanently and totally disabled *as of* June 1, 1999, but rather that he "*is currently* permanently and totally disabled from the June 1, 1999 injury." *Id.* at 68 (quoting Arbitration Decision, Defs.' App. at 109–10).

▆▆▆ "The doctrine of judicial estoppel 'prohibits a party who successfully and unequivocally asserts a position in one proceeding from asserting an inconsistent position in a subsequent proceeding.'" *Duder v. Shanks*, 689 N.W.2d 214, 220 (Iowa 2004) (quoting *Roach v. Crouch*, 524 N.W.2d 400, 403 (Iowa 1994)). The doctrine is a "commonsense" one, the purpose of which is to "protect the integrity of the judicial process." *Vennerberg Farms, Inc. v. IGF Ins. Co.*, 405 N.W.2d 810, 814 (Iowa 1987). A related doctrine is the one of collateral estoppel,[7] also known as issue

---

**7.** While Defendants' brief provided in the heading that Plaintiff was collaterally estopped from seeking the present damages, the brief itself only discusses judicial estoppel. Nonetheless, since the issues are closely related, the Court will examine whether collateral estoppel is applicable in the present context.

preclusion. The doctrine of collateral estoppel provides that "once a court has decided an issue of fact or law necessary to its judgment, the same issue cannot be relitigated in later proceedings." *Winnebago Indus., Inc. v. Haverly,* 727 N.W.2d 567, 571 (Iowa 2006) (citing *Hunter v. City of Des Moines,* 300 N.W.2d 121, 123 n. 2 (Iowa 1981)). Like judicial estoppel, collateral estoppel is designed to "further 'the interest of judicial economy and efficiency by preventing unnecessary litigation,'" and is as well intended to "protect litigants from 'the vexation of relitigating identical issues with identical parties....'" *Id.* at 571–72 (quoting *Am. Family Mut. Ins. Co. v. Allied Mut. Ins. Co.,* 562 N.W.2d 159, 163 (Iowa 1997)).

To establish that Plaintiff's damages are barred by the doctrine of judicial estoppel, Defendants must demonstrate that the present case "involv[es] privity with, or prejudiced to, the party invoking the doctrine," and that an "inconsistent position has been successfully asserted in the prior tribunal." *Wilson v. Liberty Mut. Group,* 666 N.W.2d 163, 166 (Iowa 2003). To establish that Plaintiff's damages are barred by the doctrine of collateral estoppel, Defendants must demonstrate that: 1) the issue determined in the arbitration proceeding was identical to the issue in this case; 2) the issue was raised and determined in arbitration proceeding; 3) the issue was material and relevant to the disposition in arbitration proceeding; and 4) the determination of the issue in the arbitration proceeding was necessary and essential to the resulting judgment. *Winnebago,* 727 N.W.2d at 572.

■■■ The Court agrees with Plaintiff that the damages here at issue are not barred by either the doctrine of judicial

estoppel or the doctrine of collateral estoppel. With regard to the doctrine of judicial estoppel, assuming that the privity element has been satisfied, Defendants have shown only that Plaintiff asserted that he was permanently and totally disabled, *not* that he ever asserted that he was permanently and totally disabled *solely* as a result of the June 1, 1999 injury. Absent evidence that Plaintiff actually asserted this position, the doctrine of judicial estoppel is inapplicable in attempting to obtain the result that Defendants desire.[8] Moreover, even if Plaintiff had asserted the position that Defendants claim, a finding that the June 1, 1999 incident was the *sole* proximate cause of Plaintiff's disability would not have been material to the Deputy Commissioner's holding in the arbitration proceeding, as the only relevant issue was whether the injury was *a* proximate cause of Plaintiff's disability:

> [I]t is apparent judicial estoppel applies only when the position asserted by a party was material to the holding in the prior litigation. This approach most closely tracks the rationale underlying judicial estoppel, as reflected in our prior pronouncement that, "[a]bsent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent, misleading results exists." When the inconsistent facts are not material to the disposition of the successive proceedings, these facts do not pose a risk of producing inconsistent or misleading results. Consequently, where there is no risk of inconsistent or misleading results, the rationale underlying the judicial estoppel doctrine is not advanced and there is no reason to apply the doctrine.

8. While it is clear that Plaintiff did assert that the June 1, 1999 injury was *a* cause of his damages, this assertion is not identical to or inconsistent with a position that other factors could have proximately caused his damages as well.

*Tyson Foods, Inc. v. Hedlund,* 740 N.W.2d 192, 198 (Iowa 2007) (internal citations omitted).

The better argument is premised on collateral estoppel, however, that argument fails as well. The Deputy Commissioner held a hearing on Plaintiff's workers' compensation claim in December 2002, and its arbitration decision was rendered on January 22, 2003. Pl.'s App. at 97–112. In reaching the issue of whether Plaintiff was totally and permanently disabled, the Deputy Commissioner stated:

The next issue to be resolved is whether the claimant's June 1, 1999, injury was the cause of a permanent disability.

The claimant has the burden of providing by a preponderance of the evidence that the *injury is a proximate cause* of the disability on which the claim is based. A cause is proximate if it is a substantial factor in bringing about the result; *it need not be the only cause*

. . . .

Defs.' App. at 108. After reciting the evidence supporting a causal connection between the June 1, 1999 injury and Plaintiff's disability, the Deputy Commissioner concluded that "[Plaintiff] has proved that the work injury on June 1, 1999, caused a permanent disability." *Id.* at 109. It is clear when reading the entire decision of the Deputy Commissioner that the only issue being examined was whether Plaintiff's disability was caused by the June 1, 1999 incident. The Deputy Commissioner's express language, recited verbatim in italics above, that an event need not be the *sole* cause of an outcome to be considered a legal cause of that outcome, makes clear that the Deputy Commissioner did not find the June 1, 1999 injury to be the exclusive cause of Plaintiff's disability. Thus, the issue litigated in the arbitration proceeding is not identical to the issue in this case, and collateral estoppel is inapplicable.

b. *Sufficiency of the evidence of past lost wages.*

█ Defendants next argue that the evidence presented at trial was insufficient to show that Plaintiff suffered any loss of wages caused by Defendants' bad faith handling of his workers' compensation claim, as opposed to the June 1, 1999 injury itself. In particular, Defendants urge:

[Plaintiff] was totally disabled by his June 1 injury [as of August 3, 1999]. He would not have earned any wages unless and until he recovered sufficiently from the June 1, 1999 injury to return to work (and did so prior to trial, when the lost wage period ended). Thus, to prove loss of wages *caused by Defendants' bad faith conduct,* Zimmer needed to prove that, but for the denial of his claim, he would have recovered, prior to trial, from the disability caused by his June 1 injury.

Defs.' Br. at 62–63. Defendants further point out that the only evidence that even arguably indicates that Plaintiff would have been able to return to work during the loss period was that of Dr. Rypma, Plaintiff's psychologist. This testimony, according to Defendants, is deficient in several respects: 1) all of Dr. Rypma's statements are in the present tense and do not purport to address Plaintiff's ability to work prior to trial; 2) Dr. Rypma did not begin treating Plaintiff until June 10, 2004, meaning that he would only have been able to assess Plaintiff's ability to return to work based on medical records, none of which attribute his inability to work to the mishandling of his workers' compensation claim; 3) Dr. Rypma does not differentiate the extent to which Plaintiff's inability to work was caused by the exacerbation of his problems by the mishandling of his workers' compensation claim, as opposed to the injury giving rise to the workers'

compensation claim itself; 4) Dr. Rypma's testimony provides only a speculative basis on which to estimate when during the loss period Plaintiff would have been able to return to work.

Plaintiff counters first that Defendants are incorrect in their proposition that Plaintiff must demonstrate that he could have returned to work. This argument, according to Plaintiff, fails to consider the concept, discussed previously, that an element of damage can have more than one proximate cause. Plaintiff argues that no doctor, court, or agency, ever held that Plaintiff was unable to work from the date of his injury to the time of trial solely as a result of his back injury. Plaintiff claims to have sustained his injury on June 1, 1999. He did not return to work at any time between that date and the date of trial. While no doctor or court ever held that Plaintiff was unable to work solely because of his back, it is clear that Plaintiff's inability to work between the date of the injury and August 3, 1999, the date of the first denial of Plaintiff's workers' compensation claim, could *not* have been due to Defendants' bad faith handling of the claim. The Court agrees that Plaintiff does not need to demonstrate that he could have returned to work between August 3, 1999 and the date of trial to receive lost wages damages, so long as Plaintiff sufficiently proved that his inability to work during those dates was proximately caused by the bad faith conduct of the Defendants. Such damages cannot include "any damages that were caused by [Plaintiff's] injuries sustained on June 1, 1999," Final Inst. No. 14, nor can the damages be duplicative of damages for which Plaintiff was already compensated under workers' compensation. The relevant inquiry, then, is whether Plaintiff presented adequate evidence at trial from which the jury could reasonably conclude that his inability to work between August 3, 1999 and the date

of trial was proximately caused by the bad faith of Defendants in handling Plaintiff's workers compensation claim.

The parties do not dispute that the only evidence potentially supporting Plaintiff's damages for past lost wages is that of Dr. Rypma. Dr. Rypma's area of specialty is clinical psychology. Trial Tr. at 570. Dr. Rypma stated that Plaintiff had previously treated with Dr. Koithan, but that Dr. Koithan had reached a point where he did not feel that his services to Plaintiff were effective. *Id.* at 571. Plaintiff's counsel referred Plaintiff to Dr. Rypma, and the medical relationship between the two commenced on June 10, 2004, following a referral from Plaintiff's attorney. *Id.* Dr. Rypma stated that he spent approximately six months in the treatment relationship establishing trust with Plaintiff, with certain therapeutic goals in mind. *Id.* at 573–74. Specifically, Dr. Rypma hoped to help Plaintiff develop cognitive strategies to deal with his depression, ensure Plaintiff remained safe, assist Plaintiff in returning to work, and help Plaintiff understand the relationship between "his emotional condition and the psychological experience of the pain." *Id.* at 574. Dr. Rypma noted that with chronic pain patients such as Plaintiff, environmental stress manifests itself frequently as enhanced physiological pain. *Id.* Helping patients understand that relationship assists them in being able to manage physiological pain more effectively. *Id.* at 574–75.

Dr. Rypma recounted for the jury the background information he was aware of regarding Plaintiff's condition: Plaintiff sustained an initial back injury and surgery in 1988, ongoing back problems in the following years, treatment for depression beginning in February 1999, and treatment for worsening back pain in March 1999. *Id.* at 576–77. Plaintiff sustained another injury to his back on June 1, 1999.

*Id.* at 577. Dr. McGuire saw Plaintiff soon after the injury and believed that Plaintiff's psychological condition was preventing him from returning to work, as opposed to his back condition. *Id.* at 577. Plaintiff then saw Dr. Leth, who reported that the back pain was legitimate, but that Plaintiff's mental problems had been exacerbated by the injury he sustained. *Id.* On August 3, 1999, the first denial of Plaintiff's workers' compensation claim occurred, and shortly thereafter, Dr. Leth noted that Plaintiff's mental condition had deteriorated. *Id.* at 578. Plaintiff had a second back surgery in March 2000, submitted causation evidence from Dr. Giordano to the workers' compensation adjuster, and received another denial of his claim in June 2000. *Id.*

After recounting Plaintiff's history, Dr. Rypma testified that Plaintiff:

> [W]as exceedingly focused ... nearly fixated on what his perception ... was that his workers' comp carrier had been engaging in conduct that Mr. Zimmer felt was unfair and designed to prevent him from having—from obtaining compensation that he believed that he deserved.... [T]o this day I can't get him off that subject. I can talk with him about, oh, any number of things, issues that are going on at home for him, for example, and within a matter of minutes he has brought whatever we're speaking about around full circle to project onto the insurance carrier his belief that he would have been able to function better in that situation had he—had it not been for what the insurance carrier had done to him.
>
> He believed that he was—that he wanted to go back to work. We would talk about him going back to work. It is my belief, from my meetings with him that he's too mentally distressed to go back to work, and I think the focus of that

distress is his belief that his insurance carrier had treated him wrongly.

*Id.* at 579–80. Dr. Rypma testified that Plaintiff's emotional distress over his treatment by the workers' compensation carrier affected his physical perception of pain, his stress level, and other aspects of his mental health. *Id.* at 580–84.

Regarding Plaintiff's ability to work, Dr. Rypma testified as follows:

Q. Doctor, through your history with Mr. Zimmer, and review of his history, I think you indicated you were aware that he had a previous work injury, the back surgery I think in '85 or '88?

A. 1988 was his surgery. I believe his injury was, perhaps, in '86, as I recall.

Q. From a review of his history, Mr. Zimmer went to work after that time?

A. Yes, he did.

Q. I think you also indicated that part of his goals are, at least as he's expressed, and you've expressed, the need for him to work?

A. Yes.

Q. Is his mental health at this stage what's precluding him from returning to work?

A. I believe it is, yes.

Q. The emotions and stresses he's suffering from?

A. Yes. I believe it's his current emotional condition, and particular stressors as they come up throughout the week—or throughout his period of time between sessions, reinvigorate, if you will, his current emotional expression.

Q. Do you get the belief from Mr. Zimmer that if he had been treated fairly from the insurance company

that he'd be able to deal with these issues and return to work?

A. That would be my thought, yes. I think that Mr. Zimmer also believes that because he was working....

. . .

Q. Prior to June 1st of 1999, was there anything in the medical history dealing with his mental health that was precluding him from working?

A. No, there wasn't. I mean, he had, prior to 1999, certainly, difficulties that were characterizing his behavior from, I think, as I recall, back as far as 1987, but he was still working.

Q. And his fixation in his meetings with you, and his appointments with you, has been the mistreatment by the insurance company towards him?

A. Yes. And they seem to exacerbate around issues of nonpayment, his perception of issues of nonpayment, his requirements to engage in physical therapy, his requirement to undergo functional capacity exams, the—anything that he thought the insurance carrier was doing to prevent him from being fairly compensated would result in a deterioration of his emotional condition, and in increase in his reporting of pain.

Q. So these stressors have a direct relation to the pain that he suffers?

A. Yes.

Q. Which then keeps him from being able to work?

A. Yes.

Trial Tr. at 587–90.

On redirect examination, Dr. Rypma offered additional testimony on Plaintiff's ability to work, noting that Plaintiff had mental health problems dating back sever-al years, and that the denial on August 3, 1999 was "the straw that broke the came's back, so to speak, and I think there was a continual deterioration after that period of time." *Id.* at 610. Additionally, Dr. Rypma testified:

Q. Did the denials of the workers' compensation benefits that Mr. Zimmer—or the denials that he had, in your opinion, have they affected his thought process?

A. I think they've worsened his thought process. He was, as I've testified, he certainly had mental health issues prior to his June 1st injury. I think the June 1st, 1999, injury then exacerbated his condition and I think left him feeling as if he was going to be fairly compensated. And when that did not occur, he began deteriorating.

. . .

Q. As a result of your treatment and analysis, have you developed an opinion as to the cause of Mr. Zimmer's inability to work?

A. Yes.

Q. And what is that opinion?

A. I think that his inability to work has to do with his current psychological status. And I think that status was caused by his perception of the wrongful conduct of the insurance carrier, and specifically began on or about August 3rd of 1999.

Q. Have you developed an opinion as it relates to his currently diagnosed medical conditions?

A. Yes.

Q. What do you have as a diagnosed medical condition at this stage?

A. Chronic pain syndrome.

Q. Do you have an opinion of what's causing that?

A. Yes. A combination of his injuries to his back, and his injuries to his psychological well-being.

Q. And is that tied into the denials of the workers' compensation benefits, in your opinion?

A. In part, yes, sir.

*Id.* at 610–12.

The Court has reviewed the evidence and the arguments of the parties, and concludes that the record does not support an award for past lost wages or earnings. This conclusion is based on several factors. First, Dr. Rypma's testimony, as Defendants assert, is exclusively in the present tense. Dr. Rypma states, "he's too mentally distressed to go back to work," and answers affirmatively when asked if Plaintiff's mental health is what's precluding him from working "*at this stage.*" Dr. Rypma further states that "it's his current emotional condition" that is preventing Plaintiff from working and that if Plaintiff had been treated fairly, he would "be able to deal with these issues and return to work." None of this testimony, discussing present impressions (which notably are made well over seven years after the inability to work began), gives rise to a reasonable inference that Plaintiff's mental condition prevented him from working during the relevant loss period, particularly prior to the point at which Plaintiff commenced treatment with Dr. Rypma. Without evidence that Plaintiff's inability to work from August 3, 1999 to the time of trial was caused by the bad faith conduct of the Defendants, the only way that Plaintiff can demonstrate that the bad faith caused his *continued* inability to work, would be to present evidence that, at some point in time, he would have been able to return to work were it not for Defendants' tortious conduct. Nothing in Dr. Rypma's testimony provides a basis for such a conclusion.

Moreover, Dr. Rypma's testimony, as Defendants point out, does not differentiate the extent to which Plaintiff's inability to work was caused by the exacerbation of his problems by the mishandling of his workers' compensation claim, as opposed to the injury giving rise to the workers' compensation claim itself. It is well established that Plaintiff had mental difficulties prior to the June 1, 1999 injury. It is equally well-established by Dr. Rypma's testimony that Plaintiff's dissatisfaction with Defendants' handling of his workers' compensation claim caused his mental condition to deteriorate. However, it is also apparent from the record that Plaintiff's mental deterioration was also precipitated by the June 1, 1999 injury itself. Indeed, Dr. Rypma noted that Dr. McGuire had opined that Plaintiff was unable to work due to his mental condition *prior* to the August 3, 1999, the date of the first denial of Plaintiff's workers' compensation claim. Dr. Rypma's testimony, therefore, simply does not provide a reasonable fact-finder with an adequate basis to determine either a point in time that Plaintiff's inability to work was caused by Defendants' bad faith, or any indication of the extent to which Plaintiff's inability to work was caused by Defendants' bad faith conduct, as opposed to the June 1, 1999 injury. Accordingly, the Court must conclude that there is insufficient evidence to sustain the jury's award of past lost wages and that award must be set aside.

c. *Sufficiency of the evidence of lost future earning capacity.*

Defendants next argue that Dr. Rypma's testimony is deficient as to Plaintiff's damage claim for loss of future earning capacity. Specifically, Defendants claim that Dr. Rypma "has not evaluated nor is he competent to evaluate the effect of Plaintiff's continuing physical problems,

as they would have been had Plaintiff's claim been handled differently. And, unless the initial denial of Plaintiff's claim can be found wrongful, the testimony does not show that any later mishandling of the claim caused any incremental injury, beyond what Plaintiff had already suffered from the June 1 injury." Defs.' Br. at 65–66.

 Damages for future lost earnings, also referred to as impairment of earning capacity, "is determinable by the difference between the value of an individual's services, if working, as he would have been but for the injury, and the value of the services of an injured person, if working, in the future." *Anthes v. Anthes*, 258 Iowa 260, 139 N.W.2d 201, 207 (1965) (citation omitted). "It is based upon capacity to earn, not on earnings alone." *Id.* Thus, there is no need for Plaintiff to demonstrate that he will be able to return to work in the future to make a recovery, though the likelihood that he will be able to return to work in the future would necessarily impact the amount of any damages award.

Dr. Rypma's testimony, quoted extensively in the previous section, provides ample support for the jury's finding that Plaintiff is entitled to lost future earnings. As discussed, the jury was well within its authority to find that there was no reasonable basis for Defendants' denial of Plaintiff's workers' compensation claim on August 3, 1999, or for the continued denial of Plaintiff's claim. Thus, Dr. Rypma's present-tense testimony, which was insufficient to support a claim for past lost wages, is precisely the type of evidence necessary to support a claim for future lost wages. Dr. Rypma's testimony that Plaintiff is "too mentally distressed to go back to work,"

that "it's his current emotional condition" that is preventing Plaintiff from working, and that if Plaintiff had been treated fairly, he would "be able to deal with these issues and return to work," all provide support for the jury's determination that Defendants' bad faith conduct in its handling of Plaintiff's workers' compensation claim were a proximate cause of damage to Plaintiff's future earning capacity. The fact that Plaintiff suffered from a previous mental infirmity does not prohibit this conclusion, as the testimony of Dr. Rypma and Plaintiff established that Plaintiff's condition prior to any bad faith conduct of the Defendants was not disabling, but that it made him more susceptible to suffering greater injury as a result of Defendants' tortious conduct than another person might have been. *See Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 730 (Iowa 1976) (discussing the "eggshell doctrine," which recognizes the well-established principle that "a tort-feasor takes the person he injures as he finds him").[9]

### 2. *Function of body or mind.*

The jury returned a damages award in favor of Plaintiff in the amount of $500,000 for past loss of function of body or mind, and in the amount of $3,000,000 for future loss of function of body or mind. Defendants argue that neither award is supported by the evidence, as Dr. Rypma's testimony makes clear that Plaintiff's ongoing problems are caused by his perceptions of unfairness in the way he was treated in regard to his workers' compensation claim. Defendants point out that Dr. Rypma's testimony reveals that Plaintiff was also distressed about other aspects of his treatment, such as "incompetence of his doctors" and the fact that he had to

9. The jury was instructed on the eggshell doctrine. Final Inst. No. 7. The doctrine and the Court's discussion of it in regard to lost future wages is equally applicable to the discussion, *infra,* of the other measures of damages that the jury awarded to Plaintiff.

undergo a functional capacity examination. Defendants proffer that, to the extent that any of Plaintiff's claimed loss of function of body or mind was caused by those perceptions, such loss was not caused by the Defendants' bad faith, and thus is not compensable.

The Court agrees that Defendants are not liable to compensate Plaintiff for any loss not proximately caused by the Defendants' tortious conduct.[10] The jury was adequately instructed on this issue, however. *See* Final Inst. No. 14 ("[T]he amount you assess for damages must not exceed the amount proximately caused by the 'bad faith' conduct of the Defendants, as proved by the evidence.... Plaintiff is not entitled to recover damages for any physical ailment or disability which existed before Defendants' bad faith actions, nor is Plaintiff entitled to recover for any injuries or damages he has now which were not proximately caused by the Defendants' bad faith."). Defendants have not presented any evidence which would lead the Court to conclude that the jury awarded damages on an impermissible basis or that the jury did not appropriately adhere to the Instructions given them. *See United States v. Betterton*, 417 F.3d 826, 832 (8th Cir. 2005) (" 'A jury is presumed to follow its instructions.' ") (quoting *United States v. Flute*, 363 F.3d 676, 678 (8th Cir.2004)).

Defendants' only other argument on the issue of loss of function of body or mind is that, "unless the evidence will support a finding that the initial denial was wrongful ... there is no evidence that any other bad faith conduct that may have occurred caused any harm to the functioning of Zimmer's body and mind." Defs.' Br. at 70. The Court has already concluded, however, that the initial denial of Plaintiff's workers' compensation claim was not fairly debatable as a matter of law and that the jury reasonably could have concluded from the evidence presented at trial that there was no reasonable basis for the initial, or for the ongoing denial of Plaintiff's workers' compensation claim, and that the insurer knew or should have known that it had no reasonable basis for the denial. Though Defendants disagree with this finding, they concede that "[i]f the initial denial was wrongful, the testimony ... shows causation of at least some injury to Zimmer's thinking, even if the amount awarded is excessive."

3. *Verdict against the weight of the evidence.*

█ Defendants argue that the jury verdict is against the weight of the evidence. Defendants make no new arguments, but merely state conclusorily that the evidence is too thin to support the jury verdict. The district court "can only disturb a jury verdict to prevent a miscarriage of justice." *Beckman*, 804 F.2d 435 at 439 (citation omitted). The jury is the traditional finder of facts in a trial, and as such, the " 'judge may not usurp the functions of the jury ... [which] weighs the evidence and credibility of witnesses.' " *White*, 961 F.2d at 780–81. This recognition of the role of the jury means that "[i]t must be assumed that the facts of the case have been correctly found by the jury," *Barreda*, 62 U.S. at 166, 21 How. 146, and that the court should not "disturb a jury's verdict unless [it] determine[s] that no reasonable juror could have found for the nonmoving party based on the trial record."

---

**10.** A recent opinion by the Iowa Supreme Court discusses the concept of duplication of damages extensively, *see Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 121–22 (Iowa 2007), finding that certain measures of tort damages are not duplicative of "benefits" received from workers' compensation, since workers' compensation benefits only authorize recovery for damages flowing from and related to an industrial disability.

*Sanders,* 315 F.3d at 943 (citation omitted). In sum, the Court should only grant Defendants' motion in this regard if it determines that "a miscarriage of justice has occurred." *Fireman's Fund,* 466 F.2d at 187.

As the Court has discussed throughout this order, the evidence was sufficient to permit the jury to find by the requisite legal standard that Defendants acted in bad faith both in initially denying, and in continuing to deny, Plaintiff's workers' compensation claim. Such conclusion was within the sound province of the jury and as such, there was no miscarriage of justice and no judgment as a matter of law or new trial is warranted.

### 4. *Compensatory damages excessive.*

Defendants urge that the compensatory damages awarded in the case are excessive. The jury awarded, $571,529 for past lost wages, $1,515,924 for loss of future wages, $500,000 for past loss of function of body or mind, $3,000,000 for future loss of function of body or mind, $1,500,000 for past emotional distress, and $3,000,000 for future emotional distress, for a total compensatory damages award of $10,087,453.[11] Earlier in this order, the Court set aside the jury's award of damages for past lost wages in the amount of $571,529, leaving a total compensatory damages award of $9,515,924. Defendants point out that only two Iowa appellate cases deal with verdicts this large and that the present case is not sufficiently on par with the severity of the tortious conduct in those cases to be sustained. *See Cawthorn v. Catholic Health Initiatives Corp.,* No. 04–1724, 2006 WL 3313982 (Iowa Ct.App. Nov. 16, 2006); *Estate of Pearson v. Interstate Power & Light Co.,* 700 N.W.2d 333 (Iowa 2005).

With regard to jury verdicts, the Iowa Supreme Court has held:

Our case law shows that we have been loath to interfere with a jury verdict. In considering a contention that the verdict is excessive, the evidence must be viewed in the light most favorable to the plaintiff. *DeBurkarte v. Louvar,* 393 N.W.2d 131, 139 (Iowa 1986). Fixing the amount of damages is a function for the jury. The court should interfere only when the damage award is "flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support." *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984). We have stated that the most important of these reasons is whether there is support in the evidence. *Miller v. Young,* 168 N.W.2d 45, 53 (Iowa 1969) (quoting *Mazur v. Grantham,* 255 Iowa 1292, 1303, 125 N.W.2d 807, 813–14 (1964)). A verdict should not be set aside merely because the reviewing court would have reached a different conclusion, although the court "has inherent power to set aside a verdict which fails to do substantial justice

---

11. Defendants have made no specific argument regarding the jury's award of past and future emotional distress damages. Accordingly, the Court will not evaluate whether such damages were excessive. The Court does, however, note that the damages awarded would likely not be found excessive, as emotional distress damages are highly subjective and are generally committed to the sound discretion of the jury, especially in situations where, as here, the jury is being asked to determine injuries not easily calculated in economic terms. *See Estate of Pearson v. Interstate Power & Light Co.,* 700 N.W.2d 333, 347 (Iowa 2005) ("Damages for physical and mental pain and suffering cannot be measured by any exact or mathematical standard and must be left to the sound judgment of the jury.") *see also Jenkins,* 859 F.2d at 600; *Morrissey v. Welsh Co.,* 821 F.2d 1294, 1299 n. 3 (8th Cir.1987).

between the parties." *Moore v. Bailey*, 163 N.W.2d 435, 436 (Iowa 1968).

*Sallis v. Lamansky*, 420 N.W.2d 795, 799 (Iowa 1988).

The evidence in this case is substantial and has been discussed extensively in previous orders of the Court and throughout this order. In sum, the evidence reasonably showed that Plaintiff was approximately 47 years old at the time of trial. After graduating high school, he joined the Army, receiving several honors. Trial Tr. at 439–40. After his discharge, Plaintiff went to college and received training as an electronic engineer, and eventually became employed in that field. *Id.* at 440. He maintained employment with Allen Test Products from 1983 to 1989, leaving after injuring his back on the job. *Id.* at 441. He then sought more sedentary work, working for short periods of time for several different companies, and longer periods of time for others, until his eventual injury on June 1, 1999, while working for the company now known as Wells Fargo.[12] Since that injury, Plaintiff has been unable to work, or even, according to his own testimony and that of Dr. Rypma, to participate in hobbies to any significant extent. Plaintiff testified that his spirit was broken and that he has suffered significant mental, physical, and emotional problems. Plaintiff's testimony, and that of Dr. Rypma, demonstrate that the ongoing nature of Plaintiff's problems has been caused in large part, or exacerbated substantially, by the Defendants' bad faith handling of Plaintiff's workers' compensation claim. The testimony of Plaintiff and Dr. Rypma also indicated a reasonable likelihood that Plaintiff's likelihood of ever fully recovering from these problems is poor.

With regard to future loss of earning capacity, the Court instructed the jury that Plaintiff's remaining life expectancy was 31.87 years, or approximately 382 months. The jury awarded Plaintiff $1,515,924. Plaintiff testified that at the time that he ceased working in June 1999, he was making $57,000 per year. Trial Tr. at 562. Plaintiff testified that from the start of his employment with Wells Fargo, to the time of his injury, he received an 8.9% raise, an 11.6% meritorious raise, a 6% raise, and another 5–6% raise. Trial Tr. at 480–81. Plaintiff also testified that he receives $649.19 per week in workers' compensation benefits, an amount which translates to $33,757.88 per year. *Id.* at 480.

Taking the evidence in the light most favorable to the jury's verdict, the Court finds that the future loss of earning capacity award is not excessive. Given the information that the jury had before it, the jury could have concluded that Plaintiff's salary on the date of trial would have increased and continued to increase over the coming years. Even with a conservative annual increase of 6% per year,[13] and discounting the amount to its present value and reducing the amount by Plaintiff's workers' compensation benefit, there is a net loss at full retirement age of $1,570,656:

| Year | Age | Annual salary with 6% increase per year | Annual workers' compensation benefit | Net loss |
|------|-----|------|------|------|
| 2007 | 47 | 57000 | 33758 | 23242 |

12. Plaintiff worked as a senior systems engineer when he was first hired by Wells Fargo (known as Norwest at the time). He later was promoted to a special project and worked as a systems administrator. Trial Tr. at 444.

13. While 6% may not be conservative from a purely fiscal viewpoint, it is a quite conservative number in light of the evidence before the jury.

| | | | | |
|---|---|---|---|---|
| 2008 | 48 | 60420 | 33758 | 26662 |
| 2009 | 49 | 64045 | 33758 | 30287 |
| 2010 | 50 | 67888 | 33758 | 34130 |
| 2011 | 51 | 71961 | 33758 | 38203 |
| 2012 | 52 | 76279 | 33758 | 42521 |
| 2013 | 53 | 80855 | 33758 | 47097 |
| 2014 | 54 | 85707 | 33758 | 51949 |
| 2015 | 55 | 90849 | 33758 | 57091 |
| 2016 | 56 | 96300 | 33758 | 62542 |
| 2017 | 57 | 102078 | 33758 | 68320 |
| 2018 | 58 | 108202 | 33758 | 74444 |
| 2019 | 59 | 114694 | 33758 | 80936 |
| 2020 | 60 | 121576 | 33758 | 87818 |
| 2021 | 61 | 128871 | 33758 | 95113 |
| 2022 | 62 | 136603 | 33758 | 102845 |
| 2023 | 63 | 144799 | 33758 | 111041 |
| 2024 | 64 | 153487 | 33758 | 119729 |
| 2025 | 65 | 162696 | 33758 | 128938 |
| 2026 | 66 | 172458 | 33758 | 138700 |
| 2027 | 67 | 182806 | 33758 | 149048 |
| Total | | | | 1570656 |

The jury was by no means constrained by a 6% annual increase in salary, particularly given that the evidence in the record showed that Plaintiff's annual raises, so far, had been at least that much, but often more. Likewise, the jury was not constrained by using a retirement age of 67, as opposed to a later age. And indeed, Plaintiff's life expectancy as of the date of trial was well over 30 years, though the jury was not bound by this figure in its deliberations either. Even reducing the Court's sample figure to present value, when one considers the sundry variations that the jury could have considered,[14] it is clear that there is evidence in the record supporting the jury's determination.

With regard to the jury's awards for loss of function of body or mind, the jury awarded $500,000 for past loss of function of body or mind. It was over 7½ years from the date of Defendants' first denial of Plaintiff's claim to the first day of trial. This equates to a jury award for past loss of function of body or mind of approximately $66,670 per year. Given Plaintiff's testimony, and that of his physicians, about the severe effect that Defendants' bad faith had on both Plaintiff's mental and emotional health, the Court cannot say as a matter of law that the award is excessive. Neither does the jury's award of $3,000,000 for future loss of function of body or mind shock the Court's conscience. Though Defendants argue that the award necessarily must assume that Plaintiff's injuries will grow worse, the Court disagrees. The jury was presented with testimony that Plaintiff's condition began deteriorating and continued to deteriorate from the date of the first denial of his claim. The variation in the proportion of past and future loss of function of body and mind may simply take into account the jury's conclusion that for some portion of the pre-trial period, Plaintiff's condition was not as severe as it was immediately preceding the trial or as it is likely to be or remain after the trial. While the Court recognizes that the jury's verdict in all regards is large, the Court will not presume that the jury failed to follow the Court's instructions on the issue. There is no formula from which the jury necessarily could have placed a value on Plaintiff's loss of function of his body, and it is even less reasonable to believe a formula exists to place a value on Plaintiff's lost function of his mind. These determinations, and the determinations regarding the appropriate amounts of damages were

14. Indeed, Plaintiff posits an equally plausible alternative for how the jury could have calculated its verdict in this regard. *See* Pl.'s Br. at 95–96.

within the sound discretion of the jury, and the Court finds no legal basis to alter the jury's decision.

### 5. *Punitive damages excessive.*

■ Defendants next argue that the punitive damages award was excessive. The Court notes that it has already stricken the punitive damage awards imposed against both CNA and Travelers, leaving only the punitive damage award of $1,000,000 against CSS (for which Travelers is vicariously liable). The United States Supreme Court has held that there are constitutional limits on the amount of punitive damages that a court can impose, observing that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." [15] *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This is because the Due Process Clause requires that a person receive fair notice of both the type of conduct that will result in punishment and the severity of the penalty that may be imposed. *Id.* In imposing restrictions on the amount of punitive damages that may be awarded, the Court has recognized that punitive damages generally serve the same aims as criminal punishment, without the same constitutional protections afforded defendants in criminal proceedings. *Id.* at 417.

■ The United States Supreme Court has established the following guideposts for courts to consider when determining whether a jury's award of punitive damages is excessive: 1) the degree of reprehensibility of the defendant's actions; 2) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded; and 3) the difference between the punitive damages award and the civil penalties authorized or awarded in similar cases. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594, 602 (8th Cir. 2005). The Court will examine each of these guideposts below.

### a. *Reprehensibility of conduct.*

In considering the reprehensibility of a defendant's conduct, the United States Supreme Court has instructed courts to consider whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419, 123 S.Ct. 1513. The United States Supreme Court has indicated that the presence of one of these factors alone may not be sufficient to sustain a punitive damages award, and "the

---

**15.** The Iowa Supreme Court also has a long history of limiting the amount of punitive damages awarded. *See, e.g., Saunders v. Mullen,* 66 Iowa 728, 24 N.W. 529, 530 (Iowa 1885) (deeming punitive damages award "excessive" where plaintiff sustained $50 in actual damages but received $650 in punitive damages). The Iowa Supreme Court's opinions track the United States Supreme Court's holdings in this area. *See Eden Elec., Ltd. v. Amana Co.,* 370 F.3d 824, 827–28 (8th Cir. 2004) (finding that "the same analysis is utilized in examining the legality of the punitive damage award under both federal and state due process principles").

absence of all of them renders any award suspect." *Id.*

On examination of the evidence presented in the present case, it is clear that at least two of these factors weigh in Plaintiff's favor. As discussed *supra,* there was sufficient evidence in the record to permit the jury to conclude by a preponderance of clear, convincing, and satisfactory evidence, that Defendants failed to evaluate Plaintiff's claim in accordance with reasonable claims handling practices and that this departure was done intentionally. Such conduct, taken during a time when a worker is injured and unable to work, can reasonably be seen to evince an indifference to, or reckless disregard for the health and welfare of the worker. Defendants had reason to know that there was no reasonable basis for denying, and for continuing to deny Plaintiff's claim without having reviewed all of the medical evidence, and without consideration of Plaintiff's complaints as a material aggravation of a pre-existing condition, rather than as a new, discrete injury. Moreover, Defendants had reason to know that Plaintiff was financially vulnerable, given that he was unable to work due to his injury. While Plaintiff did not present any evidence indicating that Defendants' conduct was not isolated as to other cases, he did present evidence that the conduct was not isolated as to him, that is, Plaintiff showed that Defendants acted in bad faith at more than one point during the parties' relations. Furthermore, Plaintiff presented evidence that his damages were far more than purely economic. Indeed, the evidence supports the jury's apparent conclusion that Defendants' actions caused Plaintiff severe emotional and psychological injury, which resulted in increased physiological pain. Accordingly, the Court finds that Defendants' conduct was sufficiently reprehensible to warrant some amount of punitive damages.

### b. *Disparity between actual harm and punitive damages.*

The second *Gore* guidepost concerns the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. In examining this prong, the Supreme Court has been reluctant to impose a precise mathematical formula on the amount of punitive damages that may be awarded. The Supreme Court has observed, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513. In *Pacific Mutual Life Insurance Company v. Haslip,* the Supreme Court indicated that a punitive damages award that was more than four times the amount of compensatory damages was "close to the line" of constitutional impropriety. 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Supreme Court cited the four to one ratio again in *Gore,* noting that modern-day federal statutes sometimes allow for double or treble damages. *Gore,* 517 U.S. at 581 & n. 33, 116 S.Ct. 1589; *see also Diesel Mach., Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 840 (8th Cir.2005) (affirming remitted damages award where ratio of reduced award was four to one) (citations omitted); *Stogsdill v. Healthmark Partners, L.L.C.,* 377 F.3d 827, 833 (8th Cir. 2004) (approving a four to one ratio as an "appropriate due process maximum" in light of the facts); *Eden Elec., Ltd. v. Amana Co.,* 370 F.3d 824, 829 (8th Cir. 2004) (upholding a remitted damages award with a punitive to compensatory ratio of 4.5 to one in an Iowa tort case where the conduct was "extraordinarily reprehensible"). In other cases, the Supreme Court has cited the single-digit ratio as an appropriate guideline for courts to follow. *Campbell,* 538 U.S. at 425, 123

S.Ct. 1513. In declining to establish a hard rule for limiting punitive damages, the Supreme Court has explained that a particularly egregious act resulting in low compensatory damages might warrant approval of a higher ratio. *Id.; see also Morse v. S. Union Co.*, 174 F.3d 917, 925–26 (8th Cir.1999) (approving punitive to compensatory damages ratio of six to one where district court also remitted compensatory damages award). Conversely, where compensatory damages are substantial, a lesser ratio may be all that the Constitution allows. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *see also Conseco Finance Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 825 (8th Cir.2004) (remitting punitive damages from $18 million to $7 million because the plaintiff received "a large compensatory award" in the amount of $3.5 million); *Williams v. Con-Agra Poultry Co.*, 378 F.3d 790, 799 (8th Cir.2004) (remitting punitive damages from $6 million to $600,000 where plaintiff received a substantial compensatory award, also in the amount of $600,000).

■■■ It is the Court's duty to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513; *see also Pulla v. Amoco Oil Co.*, 72 F.3d 648, 660–61 (8th Cir.1995). Here, the original punitive damages award of $3,000,000 was less than one-third of the total original compensatory damages. Even after the Court struck two of the punitive damages awards, the remaining $1,000,000 punitive damage award is only slightly less than one-tenth of the original award of compensatory damages, and slightly more than one-tenth of the modified compensatory damage award. The Court cannot say that this amount is unconstitutionally high.

c. *Civil penalties authorized or imposed in comparable cases.*

The third guidepost to consider when assessing the constitutionality of punitive damages is the amount of civil penalties authorized or imposed in similar cases. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513. It must be remembered that punitive damages are not compensatory. They "exist to punish the defendant and to deter the offending party and like-minded individuals from committing similar acts." *Ryan v. Arneson,* 422 N.W.2d 491, 496 (Iowa 1988) (citing *Pringle Tax Serv., Inc. v. Knoblauch,* 282 N.W.2d 151, 154 (Iowa 1979)). Moreover, Iowa case law has stated that "legal precedent is of limited value in evaluating the damage award of a specific case." *Id.* (citing *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 861 (Iowa 1973)). Nonetheless, the Court has reviewed case law relevant to the *Gore* guidepost, and concludes that, while very large,[16] the punitive damage award in this case is not constitutionally excessive. *See, e.g., Ryan,* 422 N.W.2d at 496 (affirming

**16.** The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend VII. The defense would have the Court presume that the mere size of the verdict, both as to compensatory and punitive damages, is a sufficient basis to set it aside. While it is true that verdicts of such a size are seldom obtained in simple tort litigation, that fact does not, standing alone, undermine the confidence that the legal system justifiably places in a jury's verdict. It is counterintuitive to think that while one jury can be entrusted to determine the life or death of a criminal defendant, another jury cannot be entrusted to appropriately calculate damages in a civil case. "[T]he trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law." 3 Blackstone's Commentaries 379.

punitive damage award of $18,600 in quite title action, even though actual damages were only $120); *White & Johnson P.C. v. Bayne*, No. 02–0757, 2003 WL 21696938, *8 (Iowa Ct.App. July 23, 2003) (upholding large portions of a punitive damage award in a defamation action); *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 136 (Iowa 1996) (remitting punitive damage award of $15 million to $2 million, even though compensatory damages were only $4000); *Eden Elec., Ltd. v. Amana Co., L.P.*, 258 F.Supp.2d 958, 972–74 (N.D.Iowa 2003) (remitting $17.875 million punitive damage award to $10 million, with $2.1 million in compensatory damages).

The Court finds that under the *Gore* factors, the punitive damage award of $1,000,000 is not unconstitutionally excessive. Indeed, since the first, and most important, guidepost in determining the appropriateness of punitive damages is the reprehensibility of the conduct, the award seems reasonable in light of Defendants' departure from normal claims handling practice in dealing with Plaintiff. This is particularly true when considering CSS's sales volume of $90 million, and Travelers net worth of $113 billion. *See Hamilton*, 621 N.W.2d at 408 (upholding a $750,000 punitive damage award as a "substantial 'sting,'" necessary to deter a company with $48 million in assets from profiting in the future by ignoring the rights of another).

### D. *Jury Instructions and Evidentiary Rulings*

#### 1. *Jury instruction number 9.*

■ Defendants argue that the Court's Final Jury Instruction No. 9 was erroneous. Final Jury Instruction No. 9 stated, in pertinent part:

An injured worker may be entitled to workers' compensation benefits for mental and physical injuries proximately caused by an injury sustained during the course of that worker's employment. *Under Iowa law, a psychological injury is compensable even if the underlying work related trauma is not a compensable injury.* The entitlement to workers' compensation benefits arises due to new injuries, cumulative injuries, or the material aggravation of an existing condition. That is, if a work related illness or injury aggravates a preexisting condition rendering the condition disabling, the employer is liable for the disability.

Final Inst. No. 9 (emphasis added). Defendants contend that the emphasized portion of the instruction is an incorrect statement of Iowa law as it existed at the time that Plaintiff's claim was adjusted.

The Court has reviewed the arguments of the parties on the issue and concludes that the instruction did not incorrectly state Iowa law or mislead the jury. Plaintiff's claimed injury in this case occurred on June 1, 1999. Long before that date, the Iowa Supreme Court held that "psychological conditions resulting from work-related physical trauma are compensable." *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12, 15 (Iowa 1993). Moreover, the emphasized language of the instruction clearly indicates that for any injury to be compensable, there must be an "underlying work related trauma." Additionally, the sentence immediately preceding the italicized portion makes clear that mental and physical injuries are compensable when they are "proximately caused *by an injury* sustained during the course of that worker's employment." Final Jury Inst. No. 9 (emphasis added). Defendants concede that "a mental injury resulting from a physical trauma is compensable."[17] Defs.' Reply

---

**17.** Defendants' arguments in this regard are circular and confusing. While Defendants

concede at one point that "a mental injury resulting from a physical trauma is compen-

Br. at 20. Nonetheless, Defendants argue that if Plaintiff did not actually suffer a compensable work related back injury on June 1, 1999, his psychological injuries are not compensable. *See Newman v. John Deere Ottumwa Works of Deere & Co.,* 372 N.W.2d at 202–03 ("If the physical trauma was imaginary it can form no basis for recovery...."). This issue was extensively discussed earlier in this order and the Court reiterates its previous conclusion in this regard, that is, the determination of whether Plaintiff actually sustained a physical injury on June 1, 1999 was one appropriately left to the jury.

### 2. *Paul Amoruso.*

Defendants argue that the Court should not have permitted Paul Amoruso to testify as an expert on workers' compensation claims handling standards "because he has no knowledge of Iowa workers' compensation law ... and as the Court is aware, workers' comp law varies across the country." Defs.' Br. at 73.

Mr. Amoruso gave the following testimony on cross-examination:

Q. I want to talk about the psychological condition here, okay, because obviously that's a big part of the report, is the mistakes you think were made in not investigating the extent of Mr. Zimmer's psychological condition. You find fault in the way those matters were handled, do you not, sir?

A. I find fault they weren't examined.

Q. Okay. Let me ask you this: Mr. Zimmer comes to CSS, to Wells Fargo, in June of 1999 and submits a claim for a physical injury. I want you to assume that that's true, okay?

A. Yes.

Q. During the course of her investigation, Ms. Beerbower obtains information that suggests that Mr. Zimmer may suffer from certain psychological or mental health conditions or impairments, okay?

A. Okay.

Q. All right, Is—setting aside whether those conditions are work-related, do you believe it's appropriate for an insurance company, or a third-party administrator, to go out and investigate whether a claimant has psychological or mental health care problems without the express permission and directive of the injured worker?

A. *I believe it is incumbent on the people investigating the workers' compensation claim to investigate all the facts that a reasonable claims person would have in front of them ... for that particular person. Mr. Zimmer was on a number of medications for treatment of his mental conditions. It was appropriate, in this case, that you look at his treatment and find out whether or not the claimed small injury of turning around was the straw that broke the camel's back.*

sable," they go on to argue that on the present facts, "compensability of the mental injury depended on existence of a compensable physical injury." Defs.' Reply Br. at 22. Defendants cite no Iowa law clearly articulating the second proposition and, in fact, the Iowa Court of Appeals recently stated that, after reviewing the case law, Iowa jurisprudence gives "no indication that the underlying phys-

ical injury must be compensable in order to give rise to the compensable mental injury." *Heartland Specialty Foods v. Johnson,* 731 N.W.2d 397, 402 (Iowa Ct.App.2007). To the extent that the Court has misunderstood Defendants' arguments in this regard, however, the issue has been appropriately preserved for appellate review.

Q. Let me ask you this about the medication because you brought it up. You know he was taking OxyContin; correct?

A. Yes.

Q. In fact, in your record you saw records that said he was taking a number of mood enhancers over the years?

A. I saw three.

Q. Those are things you think Tina Beerbower should have investigated?

A. I think she should have investigated the workers' compensation claim presented to her by Mr. Zimmer.

Q. And I don't disagree with you on that point, sir, but my question is, when the injured worker comes to an insurance company talking about a physical injury and doesn't say anything about drug issues, about drug taking, about mental health issues, is it your testimony that the insurance company has the right to go out and independently investigate those issues despite what the injured worker has told them?

A. *They have the obligation to process his workers' compensation claim to the fullest of their ability, and if that includes investigating how this mental condition can affect his small turning of the back and being unable to work, yes.* It's not done routinely. People come to workers' compensation—with workers' compensation claims, and you might see they're on Xanax. They've got a broken foot. Okay. It's different. There are different situations. If you want to lump everybody into a yes or no, that would be unfair to the people, like Mr. Zimmer, who had a problem and who needed help.

Trial Tr. at 308–10 (emphasis added). Defendants object to the italicized portions of Mr. Amoruso's testimony on the basis that they do not take into account Iowa's requirement that an *actual* physical trauma must have occurred before mental injuries are compensable.

The Court first points out that the testimony Defendants complain of by Mr. Amoruso was elicited by defense counsel on cross-examination. The Court is a bit perplexed as to how Defendants are entitled to a new trial on the basis of purportedly prejudicial testimony that they, themselves, brought out during the course of the trial. Moreover, viewing the entire colloquy between defense counsel and Mr. Amoruso, it is clear that the question is not asking about Iowa law, and that Mr. Amoruso's responses do not purport to state what Iowa law permits or requires.

Furthermore, there appears no realistic possibility that the jury could have construed Mr. Amoruso as being an expert in Iowa law. During direct examination, Mr. Amoruso responded negatively when counsel asked if his opinions "were dependent upon the specifics of any state's laws." Trial Tr. at 279. Further direct testimony also highlighted the fact that Mr. Amoruso was testifying about general claims handling practices, and not Iowa law:

Q. All right. So in connection with your opinions, have you considered the specifics of Iowa law at all?

A. No, sir.

Q. Are you an expert in Iowa law?

A. No, sir.

Q. Do you adjust claims in Iowa?

A. I don't adjust—I have not adjusted workers' compensation claims in Iowa.

Q. All right. Does that make any difference whether the claim is being handled in Iowa or any other state?

A. The medical fact gathering part is universal in concept and should be done in all claims handling environments where you want to learn the facts and the truth.

Trial Tr. at 280. Similar testimony revealing to the jury Mr. Amoruso's lack of expertise in Iowa law was elicited on cross-examination:

Q. Mr. Amoruso, you have never prosecuted a petition for arbitration, a workers' compensation claim, before the Iowa Workers' Compensation Commissioner, have you?

A. No, ma'am.

Q. In fact, you've never defended, you've never represented the employer or carrier in a workers' compensation case pending before the Iowa Workers' Compensation Commissioner; correct?

A. No, ma'am.

Q. You have not adjusted a workers' compensation claim according to the precepts and standards of the Iowa Workers' Compensation Act; correct?

A. No, ma'am.

Q. I'm not correct, or I am correct, sir?

A. I have not adjusted workers' compensation claims in Iowa.

. . .

Q. Mr. Amoruso, you have no experience whatsoever handling workers' compensation claims in Iowa, or according to the Iowa Workers' Compensation Act; is that correct?

A. That's correct. I have no experience in Iowa handling workers' compensation claims.

Q. Would you agree with me, sir, that based upon the experience you do have, there most certainly are variations amongst the workers' compensation laws in the 50 states in this country?

A. I'm not a lawyer. I can't tell you that.

Q. Okay. Well, let's talk about the body of law that governs the resolution of the issues in this case, and understanding that Judge Pratt will instruct the jury on the law, but you've offered some testimony today regarding our opinions whether the actions of the Defendants in this case were reasonable. Do you remember being asked those questions?

A. Yes, ma'am.

Q. Do you know why it is, sir, that the concept of reasonableness is important as we consider the evidence here?

A. Reasonableness is the proper way to handle a claim.

Q. Okay. Do you know how that—how the concept of reasonableness is to be assessed or evaluated under Iowa law?

A. I leave that to the judge, to make the judgments on the law.

Trial Tr. at 286–87. Additionally, the Court instructed the jury that it could give Mr. Amoruso's testimony "as much weight as [the jury thought the testimony deserved], considering the witness's education and experience, the soundness of the reasons given for the opinion, the acceptability of the methods used, and all the other evidence in the case." Final Inst. No. 4.

The Court has reviewed the objected-to testimony and finds, first, that it does not purport to state what Iowa law is, and

second, that it is not "in conflict" with Iowa law, as Defendants suggest. Mr. Amoruso's testimony merely highlighted his belief that the claims adjustors needed to act reasonably, and that this requirement may have necessitated an evaluation of the Plaintiff's mental condition. Further, having considered all of Mr. Amoruso's testimony, the fact that the purportedly objectionable testimony was elicited by the objecting party, and the Court's instructions on the issue of expert testimony, there appears no reasonable likelihood that the jury was prejudicially confused by Mr. Amoruso's testimony. Accordingly, Defendants' motion for a new trial on the basis of Mr. Amoruso's testimony is denied.

### 3. *Court comments during closing argument.*

Defendants next assert that a new trial is warranted because the Court commented on the evidence of lost wages and earning capacity in a way that gave undue influence to testimony supporting the Plaintiff's claims. Specifically, during Plaintiff's closing argument, Plaintiff's counsel was discussing Plaintiff's claimed lost wages, his earning capacity, and Dr. Rypma's trial testimony. The Court interrupted counsel, and the following appears in the record:

> Mr. Stoltze: The first question becomes a matter of lost wages. And lost wages is a little bit of a difficult issue to look at in connection with this case because workers' compensation is a substitute for the lost wages to the extent that the June 1, 1999 injury caused him to lose the wages. In other words, you lose those wages, and because you got hurt by that incident, you get workers' compensation benefits.

> But we know that workers' compensation doesn't pay for all of the wages you lose. And so what you do is you make a calculation, from our point of view. Dr. Rypma says, "Had it not been for the bad faith, we think he could have been treated and gone back to work." That means he would have been able to go back and get $57,000 a year. And he testified that he gets 3, 4, 5, 6, 7 percent types of increases, which is a reasonable amount of money. That goes up every year, wages go up a few percent every year.

> The Court: I don't recall any testimony about that. You can't get past wages beyond his recovery for workers' compensation.

> Mr. Stoltze: I'm sorry, Your Honor. I thought Mr. Zimmer testified about his percentage increases.

> The Court: It's not Mr. Zimmer's testimony I'm talking about. It's Dr. Rypma's testimony. There was no testimony he could ever return to work with treatment, there's no testimony of that by Dr. Rypma. I have his transcript.

> Mr. Stoltze: Your Honor, I didn't remember that. All right. As far as the lost wages go—and I—the judge's memory—he has the transcript. I'll rely on that. I obviously was mistaken about that....

Trial Tr. at 825–26.

Plaintiff's counsel continued with his closing argument. At the end of the closing argument, the Court stated:

> Ladies and gentlemen, you're going to have to remember what the-what Dr. Rypma said, or any of the other testimony. There's the key-not key, but one of the issues in this case that both of the lawyers have talked to you about, and that you hear about in the instructions,

is this proximate cause issue. So that's critical. So you have to rely on your memory, not mine, or that of the lawyers.

Trial Tr. at 828.

Defendants then commenced their closing argument. At a stretch break during that argument, the Court again addressed the jury:

Ladies and gentlemen, I don't know if you remember this, it's a week ago, I know I can't remember, maybe you do, I told you during the voir dire that you couldn't make a mistake, but I was entitled to because the Court of Appeals corrects me. Well, I made a mistake, and I have to tell you now because the lawyers may want to comment on my mistake.

I incorrectly told Mr. Stoltze what I thought the record was. I was wrong. You got to keep in mind that, you know, we all remember things differently, and you'll get that jury instruction. I'm going to try to correct my error this way so the Court of Appeals doesn't have to.

Generally the lawyer for the plaintiff, the party with the burden, can't comment on anything except what the defense said. The defense may, as well, want to comment on this.

Dr. Rypma testified—and you can't emphasize one part of the record more than another—"Is his mental health at this stage what's precluding him from returning to work?"

"Answer: I believe it is."

"Question: Do you get the belief from Mr. Zimmer that if he had been treated fairly from the insurance company that he'd be able to deal with these issues and return to work?"

"Answer: That would be my though, yes."

So that only goes to one item Instruction 16 talks about, "1. Past lost wages." That's the only issue this answer and my interruption of Mr. Stoltze could impact on. So Ms. Wagner will have an opportunity to comment on this, and if she doesn't, I'm going to give the Plaintiff an opportunity to comment on the Court's error. So with that, you want to take just a moment to stretch in place, you may do so.

Trial Tr. at 847–49.

Defendants argue that, while the Court was clearly making a good faith attempt to fix a mistake, it ended up prejudicing the Defendants by:

[E]ssentially validating and concurring with Dr. Rypma's testimony on lost wages and future-earning capacity. But the Court said nothing about Defendants' evidence, that Zimmer had been found to have been permanently and totally disabled *by his back injury*, before he suffered any mishandling of his claim, or about the limits of Dr. Rypma's competence to assess Zimmer's ability to return to work. Moreover, this Court was actually right the first time, because . . . Dr. Rypma's testimony did not support Zimmer's claim to have suffered wage loss in the past (the issue the Court told the jury the testimony bore on).

Defs.' Br. at 77. Accordingly to Defendants, the jury likely interpreted this Court's comments as a message that damages should be awarded on Plaintiff's claims for lost wages and future-earning capacity.

 "A federal judge is more than a 'mere moderator' or umpire in the proceedings and he may take an active role in conducting the trial and developing the evidence." *Champeau v. Fruehauf Corp.*, 814 F.2d 1271, 1275 (8th Cir.1987) (citing *Warner v. Transamerica Ins. Co.*, 739

F.2d 1347, 1351 (8th Cir.1984)). Accordingly, a trial judge may question witnesses or comment on the evidence. *Id.* Caution must be taken in exercising this right, however, as " '[i]ntonations, gestures and comment[s] of the trial judge, or the comment by itself, may be so improper as to warrant a new trial.' " *Id.* (quoting 6A J. Moore, J. Lucas & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 59.08[2] at 59–90 (2d ed.1986)). The Court of Appeals will only reverse the refusal to grant a new trial on the basis of inappropriate judicial intervention if the record discloses "actual bias on the part of the trial judge" or if the record leaves "the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *Czajka v. Black,* 901 F.2d 1484, 1486 (8th Cir.1990) (citations omitted).

While the Court does not believe its comments were appropriate, neither does it believe that they demonstrated bias or an appearance of advocacy or partiality. In its initial comments during Plaintiff's closing argument, the Court incorrectly stated in front of the jury that Dr. Rypma did not testify that Plaintiff could have gone back to work if it had not been for Defendants' bad faith. The Court almost immediately realized that the interruption was inappropriate and instructed the jury, as it had in the preliminary instructions, that the jury needed to remember for itself what the testimony in the case was, and not to rely on what anyone else said the testimony was, even the presiding judge. Upon further reviewing Dr. Rypma's testimony, the Court realized that Dr. Rypma did, in fact, testify that he believed Plaintiff would have been able to return to work were it not for the Defendants' bad faith. The Court decided that it would be too prejudicial to the Plaintiff to not correct this error for the jury. Accordingly,

the Court read the jury the relevant portion of Dr. Rypma's testimony.

As a precaution against unfairly prejudicing the Defendants by correcting its mistake, the Court specifically told the jury that it could not "emphasize one part of the record more than another." The Court also emphasized to the jury that, at most, this testimony was only relevant to the item of lost wages discussed in Final Instruction Number 16. Moreover, the Court gave counsel for both sides the full opportunity to make any comments or argument about the Court's error and attempted correction of that error. Finally, the Court clearly instructed the jury that comments by the Court are not intended to influence the verdict in any way:

> Neither in these instructions nor in any ruling, action or remark that I have made during the course of this trial have I intended to give any opinion or suggestion as to what your verdict should be.
>
> During this trial I may have occasionally asked questions of witnesses. Do not assume that because I asked questions I hold any opinion on the matters to which my questions related.

Final Instr. No. 2. This instruction, as well as the Court's preliminary instruction number twelve, which told the jurors to rely on their own memory as to what the testimony was, were both available to the jury, in print, during their deliberations.

The Court has reviewed the case law on the issue, and finds that its comments do not rise to the level of being sufficiently prejudicial to the Defendants to warrant a new trial. *Compare Champeau,* 814 F.2d at 1275 (granting a new trial where the trial judge interrupted the trial testimony 145 times, led an expert witness into irrelevant discussions, and "completely confused and perhaps misstated what the expert had said") *and Myers v. George,* 271

F.2d 168, 171 (8th Cir.1959) (finding judicial comments as a basis for reversal where trial judge commented that a witness named "True" would not live up to his name, and stated that people who attend wrestling matches are "suckers") *with Woodring v. United States,* 311 F.2d 417, 420 (8th Cir.1963) (finding no new trial warranted where trial judge interrupted witness examination on several occasions and made remarks reflecting "skepticism with reference to the statements made by some of the witnesses") *and Beardslee v. United States,* 387 F.2d 280, 296–97 (8th Cir.1967) (finding no new trial warranted where trial judge commented on the evidence by stating that defendant "pulled the trigger and wielded the paring knife as he plunged it into Gregory's heart") Moreover, the Court concludes that any error that may have resulted from its comments is harmless in light of the fact that the Court specifically told the jury that Dr. Rypma's recited testimony could only impact an award of past lost wages, and given that the Court has now set aside the jury's lost past wages damage award.

### E. *Clerical Error*

Defendants finally note that judgment was incorrectly entered against all three Defendants in a joint and several amount of $13,087,453, improperly combining the compensatory and punitive damage awards. Plaintiff and the Court agree that the judgment was incorrect. The Court, however, has set aside the independent award of punitive damages against Travelers, and has vacated the punitive damage award against CNA. Additionally, the Court has set aside the compensatory damages award of $571,529 for past lost wages. Accordingly, the Clerk of Court shall enter judgment on the compensatory damages in the amount of $9,515,924, to be paid jointly and severally by all Defendants. The Clerk shall enter judgment on the punitive damages in the amount of $1,000,000, with liability to be joint and several between CSS and Travelers.

## V. CONCLUSION

For the reasons stated herein, Defendants' Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittitur, and Motion to Alter or Amend Judgment (Clerk's No. 193) is granted in part and denied in part, consistent with the terms of this order. Defendants' Motion for Stay of Execution (Clerk's No. 226) is denied as moot.

IT IS SO ORDERED.